# Ethical Restraints of the ABA Code of Professional Responsibility on Federal Criminal Investigations

American Bar Association Disciplinary Rule 7-104 (DR 7-104), which prohibits an attorney from contacting an opposing party without prior consent from the party's attorney, does not apply to federal criminal investigations or to interrogations by FBI agents; accordingly, the Department of Justice is free to analyze the issues presented by DR 7-104 as policy questions.

The only restraints on federal law enforcement activities are those established by the Constitution and existing statutes; moreover, authorized federal investigative practices are exempt from DR 7-104 by its own terms.

Courts have taken the position generally that DR 7-104 applies to all situations in which a defendant has a Sixth Amendment right to counsel, though they have been reluctant to fetter legitimate and traditional activities of law enforcement officials in the investigative stages of a case; moreover, courts have generally held that waiver of one's constitutional right to counsel does not negate the ethical obligation of a government attorney to seek the consent of an opposing party's attorney before initiating communications with the party.

Federal courts have no power to exclude evidence, dismiss an indictment, or reverse a conviction solely on the ground that DR 7-104 was violated.

State bar associations may not, consistent with the Supremacy Clause, impose sanctions on a government attorney who has acted pursuant to his federal law enforcement responsibilities.

April 18, 1980

## MEMORANDUM OPINION FOR
## THE DEPUTY ATTORNEY GENERAL

In May 1979, representatives of the Federal Bureau of Investigation (FBI), the U.S. Attorney's Office of the Southern District of New York, and the Department of Justice's Criminal Division and Office of Legal Counsel met to discuss a growing problem confronting FBI agents and federal prosecutors: the impact of American Bar Association (ABA) Disciplinary Rule 7-104 (DR 7-104) on federal criminal investigations. Essentially, the rule prohibits an attorney from contacting an opposing party without prior consent from the party's attorney.[1] If the

---

[1] ABA Disciplinary Rule 7-104 provides:
   *DR 7-104 Communicating With One of Adverse Interest*
   A. During the course of his representation of a client a lawyer shall not:
      1. Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he
                                          Continued

rule is deemed to apply with full force to criminal investigations and to interrogations by FBI agents, it could substantially affect current FBI practices. A literal reading of the rule would prohibit an agent from seeking a waiver of *Miranda* rights from a represented defendant or target without first receiving permission from that person's attorney. It may even condemn the use of volunteered confessions or admissions made without the presence or knowledge of counsel.

This memorandum will examine (1) the current differing positions within the Department regarding the impact of DR 7-104 on criminal investigations; (2) the history and scope of DR 7-104; and (3) the authority of the federal courts and state bar associations to control federal criminal investigations. We conclude that federal law enforcement activities are limited only by relevant constitutional and statutory provisions, and that DR 7-104, by its terms, exempts authorized investigative procedures. We further conclude that courts have no authority to exclude evidence solely on the basis of a violation of DR 7-104, and state bar associations may not, consistent with the Supremacy Clause, impose sanctions on a government attorney who has acted within the scope of his federal responsibilities. Accordingly, the extent to which the Department limits its activities to conform with judicial and bar association interpretations of DR 7-104 is entirely a question of policy. This memorandum is intended to serve as a basis for that policy discussion.

We recommend that a comprehensive Department policy be formulated after this memorandum and the issues discussed herein have been subjected to the fullest examination by all interested components of the Department.

## I. Current DOJ Interrogation and Investigation Practice

In January 1978, the FBI Legal Counsel Office made a detailed analysis of the constitutionality of FBI interrogation practices. The then prevailing FBI policy required an agent to give Fifth and Sixth Amendment warnings to, *inter alia*, "any known subject of a Bureau case" and "any other person so strongly suspect that he is now to be interviewed for a confession or admission of his own guilt in the case rather than merely as a possible source of information." The Legal Counsel concluded that, under recent Supreme Court cases, these standards were overbroad. It thus suggested that the policy be changed to require pre-interview warnings only when the person: (1) has been arrested or is in custody; (2) will be arrested at the close of the interview; (3) is signifi-

has the prior consent of the lawyer representing such other party or is authorized by law to do so.

2. Give advice to a person who is not represented by a lawyer, other than the advice to secure counsel, if the interests of such person are or have a reasonable possibility of being in conflict with the interests of his client.

cantly restricted in his freedom of action; or (4) has been formally charged in a pending prosecution and the interview concerns the pending federal charge or a related federal offense. These proposals were adopted.

It is clear that current FBI interrogation policy does not assume DR 7-104 to be applicable to its agents because the FBI does not require that a subject's or defendant's counsel be notified prior to interrogation. The FBI takes the position that such notification would seriously hamper the ability of agents generally to conduct investigations and specifically to elicit confessions or admissions. The problem is apparently particularly acute in large scale organized crime investigations in which targets may be nominally represented by counsel who themselves are suspected of playing a role in the illegal activities.

In an effort to integrate DR 7-104 and current FBI policy, the Legal Counsel's office undertook an exhaustive study of the rule and the relevant constitutional principles.[2] That office concludes that the rule's requirement of notification to counsel should have no application before the initiation of formal criminal proceedings. After formal criminal proceedings have begun, agents should be permitted to interview, without notification of counsel, a person who initiates the contact if there is an adequate showing that the right to counsel is being waived.[3] Interviews should also be permitted: (1) on charges unrelated to those at issue in the formal criminal proceedings; (2) when the facts and circumstances indicate that counsel has an interest beyond the interest of his or her client and the interview does not seek admissions from the defendant; and (3) when the contact is not made for interrogation purposes. Finally, the Legal Counsel would adopt a general exception to the rule that would permit interrogation necessary to advance the investigation of a serious crime if notification of counsel would adversely affect the investigation.

The interpretation of DR 7-104 put forth by the U.S. Attorney's Office for the Southern District of New York would give the rule far more impact in the conduct of criminal investigations. That Office concludes that it is unethical for an FBI agent or an Assistant United States Attorney (AUSA) to interview a subject known to have counsel, even prior to the initiation of formal criminal proceedings. Application of the rule, in this view, depends upon knowledge of representation, not the filing of charges.

The impact of the rule has become a significant issue in the Northern District of California, where James Hewitt, Federal Public Defender, has strongly objected to FBI interviews of defendants without notification to appointed counsel. Pointing to two recent Ninth Circuit opin-

---

[2] That study has been of major assistance in the preparation of this memorandum.

[3] The FBI would not apply this rule in the Tenth Circuit. *See United States* v. *Thomas,* 474 F.2d 110 (10th Cir.), *cert. denied,* 412 U.S. 932 (1973).

ions,[4] Mr. Hewitt asserts that conduct considered proper by the FBI is condemned by the courts.

The Public Defender has also communicated his views to Representative Edwards, who has by letter of November 20, 1979 asked the Attorney General to comment on the matter. In light of Mr. Hewitt's objections, the U.S. Attorney's Office for the Northern District of California has proposed a procedure for interviewing represented defendants. The policy would: (1) permit pre-arrest FBI contacts even if the attorney of the interviewee requests the U.S. Attorney to advise the FBI not to interview his client (the U.S. Attorney would advise the attorney to instruct his client not to talk to FBI agents); (2) permit post-arrest interviews on unrelated charges only after approval by the Chief of the Criminal Division; (3) prohibit FBI-initiated post-arrest contacts without prior approval by counsel; and (4) permit defendant-initiated post-arrest interviews (even if counsel tells the FBI not to interview) after approval by the Chief of the Criminal Division of that Office. The FBI has taken issue with this procedure, asserting that it is based on ethical considerations rather than legal requirements. Furthermore, the FBI recommends that any irreconcilable differences between agents and a U.S. Attorney's Office regarding the propriety of interviews be resolved by FBI Headquarters.

In October 1979, based on the Ninth Circuit's decision in *United States* v. *Partin,* 601 F.2d 1000 (9th Cir. 1979), discussed below, the San Francisco Special Agent in Charge (SAC) recommended that a uniform policy be adopted by all FBI offices in that circuit. The policy would attempt to circumvent the ethical problems created by the Ninth Circuit's interpretation of DR 7-104 by disaggregating the prosecution team of agent and AUSA; agents would not inform AUSA's of uncounseled interviews until absolutely necessary. The SAC's assumption is that the AUSA's lack of knowledge of an intended interview would relieve him of any obligation to notify opposing counsel.[5]

The Criminal Division has recently proposed a policy for its attorneys regarding DR 7-104 and criminal investigations. The policy would prohibit an interview with a subject, target or defendant against whom charges are pending without notification to the defendant's attorney. In extraordinary circumstances (undefined), contact could be made with

---

[4] *United States* v. *Partin,* 601 F.2d 1000 (9th Cir. 1979), *cert. denied,* 446 U.S. 964 (1980); *United States* v. *Glover,* 596 F.2d 857 (9th Cir.), *cert. denied,* 444 U.S. 860 (1979).

[5] Other FBI and U.S. Attorney's Offices in the Ninth Circuit have responded to the *Partin* decision. The San Diego FBI Office reported to the Director recently that the U.S. Attorney there has taken the position that the FBI is not bound by ABA rules and that so long as the agent does not inform the AUSA, there is no problem with interviews of represented subjects without the attorney's knowledge. The Portland Bureau Office agreed with the San Francisco Office that the AUSA should not be notified in advance of interviews during the investigative stage. The SAC in Las Vegas has advised the Director that *Partin* will not affect the FBI's operations in Nevada. It is the practice of that office not to inform the U.S. Attorney's Office of proposed interviews with represented subjects in the investigative stage. The office's practices apparently were informally approved by a federal district judge in Las Vegas.

579

the written approval of the Assistant Attorney General. If opposing counsel is believed to have a conflict of interest, the Department attorney is urged to consider bringing that fact to the attention of the court and seeking the disqualification of opposing counsel. Interviews of defendants on unrelated charges would be permissible only after notification to counsel except in "compelling" circumstances. If the defendant does not wish his attorney to be present, the government attorney should advise the defendant to retain special counsel. In the absence of new counsel, an interview may occur only if the Assistant Attorney General determines that notice to counsel would place a person in physical danger or in danger of serious economic reprisal or if counsel is implicated in the underlying criminal activity. These same procedures would also apply to defendant-initiated interviews if the defendant requests that counsel not be notified.

The Criminal Division's proposed policy would obligate the government attorney to notify the case agent when he knows an individual to be represented by counsel. If private counsel requests a government attorney not to interview his client, the government attorney should inform the case agent of the restriction on contact. If the government attorney is prohibited from contacting an individual under these guidelines, an agent may not do so.[6]

## II. The Constitution and DR 7-104

Whatever interpretation of DR 7-104 the Department adopts, it plainly must abide by the limits that the Fifth and Sixth Amendments to the Constitution establish for Department law enforcement activities. The Supreme Court has held that an individual's Sixth Amendment right to counsel attaches once "judicial proceedings have been initiated against him—'whether by way of formal charge, preliminary hearing, indictment, information or arraignment.'" *Brewer* v. *Williams,* 430 U.S. 387, 398 (1979), *quoting Kirby* v. *Illinois,* 406 U.S. 682, 689 (1972).[7] Once the right to counsel has attached, the government may not elicit incriminating statements from the person unless it has obtained a waiver of his Sixth Amendment right. *Massiah* v. *United States,* 377 U.S. 201 (1964); *Brewer* v. *Williams, supra,* 430 U.S. at 405–06.[8]

It does not appear to be of constitutional significance whether the government elicits incriminating statements through agents who identify themselves, undercover agents, or informants. *See Brewer* v. *Williams, supra,* 430 U.S. at 400; *Wilson* v. *Henderson,* 584 F.2d 1185,

---

[6] To the extent the Criminal Division policy would apply DR 7-104 to the investigative stage, it differs fundamentally from the position of the FBI.

[7] While the Sixth Amendment provides no right to counsel in the investigative stage of a criminal proceeding, the Fifth Amendment guarantees a right to counsel during a custodial interrogation of a suspect. *Miranda* v. *Arizona,* 384 U.S. 436 (1966). *See Beckwith* v. *United States,* 425 U.S. 341 (1976).

[8] It has been generally held that such waiver can occur without the presence of counsel. *See, e.g., Coughlan* v. *United States,* 391 F.2d 371 (9th Cir.) *(per curiam), cert. denied,* 393 U.S. 870 (1968).

1191 (2d Cir. 1978), *cert. denied,* 442 U.S. 945 (1979); *United States* v. *Anderson,* 523 F.2d 1192 (5th Cir. 1975). The case law, however, does not define with precision what conduct constitutes interrogation. For example, the Supreme Court has recently heard argument on a case which will resolve a split in the circuits concerning the use of statements made to cellmate-informants who are instructed to listen to the defendant but not to ask questions. *United States* v. *Henry,* Oct. Term 1979, No. 79–121.* *Compare Wilson* v. *Henderson, supra,* 584 F.2d at 1190–91.[9]

The Sixth Amendment's limits on post-indictment law enforcement activities are, thus, fairly well-established. The Constitution permits the government to interview represented defendants without prior notice to their counsel, provided that the defendant waives his right to counsel. Generally, no infringement of the Sixth Amendment can occur prior to the initiation of formal judicial proceedings.[10] As discussed below, DR 7–104, as generally interpreted, provides suspects and defendants with protections that the Constitution does not.

### III. The "Authorized By Law" Exception to DR 7–104

The FBI Legal Counsel Office maintains that federal law enforcement efforts should be bound only by the Constitution, federal statutes and regulations. It suggests that FBI activities taken pursuant to 28 U.S.C. § 533,[11] which are consistent with constitutional principles, come within the exception in DR 7–104 for communications "authorized by law." As recognized by the Legal Counsel, no explicit statute authorizes FBI investigations or the questioning of represented parties.[12] Moreover, numerous cases have scrutinized FBI conduct under

---

*NOTE: In *United States* v. *Henry,* 447 U.S. 264 (1980), the Supreme Court held that the government's actions in eliciting incriminating information from a defendant through his cellmate violated the defendant's Sixth Amendment right to counsel, and that such information could not be used against him. Ed.

[9] Other conduct may infringe a defendant's Sixth Amendment right to counsel. The government may not use informants or undercover agents to learn defense strategy. *See Weatherford* v. *Bursey,* 429 U.S. 545, 554 (1977) *(dicta); United States* v. *Levy,* 577 F.2d 200 (3d Cir. 1978). *Cf. Black* v. *United States,* 385 U.S. 26 (1966) *(per curiam)* (dismissal of indictment where government overheard conversations between defendant and his counsel through electronic eavesdropping). Nor may government agents give legal advice to represented defendants or attack the competence of their counsel. *E.g., United States* v. *Morrison,* 602 F.2d 529 (3d Cir. 1979).

[10] *Escobedo* v. *Illinois,* 378 U.S. 478 (1964) (post-arrest, pre-indictment interrogation of a person who had requested but was denied counsel violated the Sixth Amendment), has been limited to its facts. *Johnson* v. *New Jersey,* 384 U.S. 719, 733–34 (1966); *Kirby* v. *Illinois,* 406 U.S. 682, 690 (1972).

[11] Section 533 provides:
> The Attorney General may appoint officials—
>> (1) to detect and prosecute crimes against the United States;
>> (2) to assist in the protection of the person of the President; and
>> (3) to conduct such other investigations regarding official matters under the control of the Department of Justice and the Department of State as may be directed by the Attorney General.
> This section does not limit the authority of departments and agencies to investigate crimes against the United States when investigative jurisdiction has been assigned by law to such departments and agencies.

[12] *Compare Nai Cheng Chen* v. *INS,* 537 F.2d 566, 569 (1st Cir. 1976) (interrogation of alien authorized by 8 U.S.C. § 1357(a)(1)).

the rule and none has suggested that all the FBI's investigatory activities fall within the "authorized by law" exception.

We believe, however, that the Legal Counsel's position has merit and, if made to a court, would be persuasive. This Office, in examining questions regarding FBI undercover operations under § 533, has adopted the general rule of statutory construction that where a statute imposes a duty, it authorizes by implication all reasonable and necessary means to effectuate such duty. For example, we have opined that FBI hiring of foreign nationals in Mexico is authorized by § 533 since it is in furtherance of legitimate law enforcement activities.[13] Courts, in interpreting statutes which establish a prohibition but except from it activities otherwise authorized by law, have recognized that conduct reasonably in furtherance of the statutory duty is authorized by law. *Chase* v. *United States*, 155 U.S. 489, 502 (1894); *Burns* v. *United States*, 160 F. 631, 634 (2d Cir. 1908). This Office has reached a similar conclusion construing 18 U.S.C. § 648, which prohibits federal officers from depositing public funds in banks "except as specifically allowed by law." We have opined that § 533 constitutes an exception where such deposits were a necessary part of an FBI undercover operation.

Under this reasoning, if FBI interrogations of suspects or defendants do not violate the Constitution and are reasonable and necessary to the proper performance of § 533 responsibilities, they may be deemed "authorized by law" and thus wholly exempt from DR 7-104 by its own terms. A similar conclusion may be reached for interviews by United States Attorneys and their Assistants. Section 547 of Title 28 authorizes U.S. Attorneys to "prosecute for all offenses against the United States." If interviews of suspects and defendants are deemed necessary and proper to the performance of that duty, such conduct should be deemed "authorized by law" and thus beyond the purview of DR 7-104.

The "authorized by law" exception to DR 7-104 would also become relevant if the Department were to promulgate regulations, consistent with the Constitution and existing statutes, authorizing agents and AUSAs to conduct interviews of represented parties. Such regulations would have the force of law, and thus activities conducted thereunder would fall within the exception. We believe that if the regulations issued were comprehensive and justified in terms of their necessity and utility to federal law enforcement, then activities taken in reliance on the regulations would not violate the rule.

We conclude, therefore, that DR 7-104, by its own terms, should not prohibit lawful FBI investigatory practices. The restraints on federal law enforcement activities are those established by the Constitution and

---

[13] This approach has been followed to uphold the activities of law enforcement agencies in the absence of explicit statutory authority. *See, e.g., United States* v. *Krapf,* 285 F.2d 647 (3d Cir. 1961) (fingerprinting).

existing statutes.[14] Accordingly, the Department appears free to ana-
lyze the issues presented by DR 7-104 as policy questions. In·order to
aid in the resolution of those questions, the remainder of the memoran-
dum will develop the rationale of DR 7-104 and examine current
interpretations of the rule by the courts and bar associations.[15]

### IV. DR 7-104: Its Origins and Meaning

DR 7-104, which derives from Canon 9 of the old ABA Canons of
Professional Ethics, is generally traced to a 19th century maxim that a
lawyer should "never enter into any conversation with [his] opponent's
client, relative to his claim or [defense], except with the consent, and in
the presence of his counsel." [16] The rationale for the rule is not set
forth in the Code, but several justifications are apparent. The most
obvious is the fear that an attorney can lead an untutored layperson to
make a damaging admission or to settle a case for less than its fair value
because of the attorney's expertise in legal matters. The opposing attor-
ney's presence may also prevent the client from waiving privileges or
from making misstatements and may help settle disputes by channelling
them through dispassionate experts. *See* Leubsdorf, *supra,* at 686-88;
D.C. Bar Comm. on Legal Ethics Op. No. 80 (1979).[17] One commenta-
tor has summed up the rule's purpose as follows:

> DR 7-104 reflects an apparent conviction that, in the
> interests of legal sportsmanship, a party should not be
> allowed to further his case by taking advantage of his
> opponent's naivete to elicit devastating statements or to
> conclude an ill-advised settlement. The legal system, ac-
> cordingly, protects a party against himself by ensuring
> that contacts with opposing attorneys will take place only
> through the party's own counsel or in his presence.

Note, *supra* note 17, at 1012.

The rule apparently grew out of concerns of attorney overreaching
in civil matters. Its applicability to criminal proceedings is not discussed

---

[14] We consider below the separate argument that state bar associations have no authority to
regulate federal law enforcement activities.

[15] As will be readily apparent in the discussion below, the federal courts and the state· bar
associations generally believe that federal law enforcement activities are subject to DR 7-104. Their
views, although perhaps not legally tenable, evidence a concern for fairness and the appearance of
justice. Thus, while we conclude that DR 7-104 may not technically bind authorized Department law
enforcement activities, we believe that the Department should be aware of those activities which have
been strenuously condemned by courts and commentators.

[16] 2 D. Hoffman, A Course of Legal Study Addressed to Students and the Profession Generally 771
(2d ed. 1836), *quoted in* Leubsdorf, *Communicating with Another Lawyer's Client: The Lawyer's Veto and
the Client's Interests,* 127 U. Pa. L. Rev. 683, 684 n.6 (1979). *See generally* H. Drinker, Legal Ethics
201-03 (1953).

[17] Leubsdorf's analysis of the rule and its rationale leads him to the somewhat cynical conclusion
that it was "probably influenced by an improper desire to protect lawyers against their own clients."
Leubsdorf, *supra* note 16, at 693. The self-serving aspect of the rule is also identified in *Note: DR 7-
104 of the Code of Professional Responsibility Applied to the Government "Party,"* 61 Minn. L. Rev. 1007
(1977).

in the Code and is mentioned in only a few state bar association ethical opinions. *See, e.g.,* ABA Informal Op. No. 1373 (1976); Mich. State Bar Ethics Op. No. 202 (1965). The Supreme Court of Washington has held that the rule is binding only in civil cases and was not intended to apply in criminal proceedings. *State* v. *Nicholson,* 463 P.2d 633, 636 (Wash. 1969). It would appear, however, that the rationale of the rule clearly applies in criminal proceedings, perhaps with more force than in the civil context. *See* Broeder, *Wong Sun* v. *United States: A Study in Faith and Hope,* 42 Neb. L. Rev. 483, 599–604 (1963). And federal courts have repeatedly held the rule applicable to the activities of federal prosecutors and their agents. *See, e.g., United States* v. *Partin, supra,* 601 F.2d 1000; *United States* v. *Thomas,* 474 F.2d 110 (10th Cir.), *cert. denied,* 412 U.S. 932 (1973); *United States* v. *Springer,* 460 F.2d 1344, 1354 (7th Cir. 1972), *cert. denied,* 409 U.S. 873 (1972).

The Solicitor General's Office, however, has recently taken the position that:

> DR 7-104 appears to have been formulated with civil cases in mind, and it is by no means clear that it should be deemed to have general application to criminal cases, in which contacts between the government and the defendant in the absence of counsel are already to a considerable extent regulated by the rule of *Massiah* v. *United States,* 377 U.S. 201 (1964).

*Partin* v. *United States, Brief for the United States in Opposition to a Petition for a Writ of Certiorari,* Oct. Term 1979, No. 79–646 (filed December 1979), at 22 n.26. In addition, this Office has, in a series of memoranda addressing ethical considerations in the context of undercover operations, taken the position that the "ABA Code does not purport to deal with the exigencies and ethical requirements of law enforcement activities." Memorandum from Assistant Attorney General Harmon to Acting Deputy Attorney General Ruff, November 9, 1979. This issue will be discussed in Part V(C) of this memorandum; the discussion of the rule that follows should be understood as assuming, *arguendo,* the applicability of the rule to criminal law enforcement procedures.

### A. The Scope of the Rule

DR 7-104 purports to prohibit *all* direct contacts of opposing parties without the prior consent of the party's attorney. The American Bar Association's Committee on Ethics and Professional Responsibility has taken the rule so seriously that it has ruled that

> it is not permissible for lawyer A to send a copy of his settlement proposal to lawyer B's client, even though he

believes that lawyer B is not relaying settlement offers submitted in connection with the litigation in question.

Informal Op. No. 1348 (1975).

The rule's total ban on communications appears inappropriate in many situations, particularly where the interests of the attorney and the client diverge.[18] Thus, a few exceptions to DR 7-104 have been recognized or suggested in state bar association opinions and cases. The Committee on Legal Ethics of the Oregon Bar Association ruled many years ago that

> [i]n spite of the clear language of [DR-7-104], this committee is not prepared to state in general terms that there can be no circumstances which will justify an attorney in communicating directly with the adverse party; but, if there are circumstances which would justify such communications, we suggest that they are quite unusual and that an attorney should refrain from such communication unless it appears that adverse counsel has consented thereto or has himself been guilty of such misconduct as to justify direct communication.

Opinion No. 9 (1938) (cited with apparent approval in *In re Schwabe*, 408 P.2d 922, 924 (Or. 1965) (*per curiam*)).[19]

It may well be that the absolute nature of DR 7-104 belongs to a bygone era. Scholarly works have criticized the underlying paternalistic justifications for the rule. *See generally,* Leubsdorf, *supra* note 16. The D.C. Bar's Committee on Legal Ethics has recently recommended a full-scale re-evaluation of the rule. D.C. Bar Op. No. 80, *supra*. And the ABA commission currently drafting a revision of the Code appears open to considering formal exceptions to the rule for law enforcement purposes.[20] But, as DR 7-104 is currently interpreted, its ban is nearly absolute.

## 1. The Definition of "Party"

DR 7-104(a) forbids an attorney from contacting an opposing "party" without the prior consent of the lawyer representing "such other party." The use of the term "party" may be significant, particu-

---

[18] *See* Alschuler, *The Defense Attorney's Role in Plea Bargaining,* 84 Yale L. J. 1179, 1194-98 (1975) (describing tactics of criminal defense attorneys who make misrepresentations to their clients in order to induce guilty pleas).

[19] *See also Drinker, supra* note 16, at 203.

Other exceptions have been read into DR 7-104. Attorneys may contact some employees of corporate parties who were witnesses to the conduct at issue in the litigation, ABA Formal Op. No. 117 (1934); and, private attorneys may contact some government officials involved in government action which is the basis of a law suit against the government. D.C. Bar Op. No. 80 (1979).

[20] The Reporter for the Commission on Evaluation of Professional Standards has indicated that the Commission would be quite interested in receiving the views of the Department on DR 7-104.

larly since DR 7-104(b), which regulates contacts with unrepresented persons, uses the word "person" rather than "party."

Arguably the term "party" could mean that the rule has application in the civil context once litigation has been brought and in the criminal context once a person becomes a defendant, *i.e.*, after a formal indictment or charge has been filed. However, we doubt that either courts or bar associations would read the rule so narrowly. The rule's salutary purpose—to prevent the overreaching of opposing counsel—would presumably warrant its application in any situation in which the interests of prospective litigants, including the government, become sufficiently adverse. This test would thus appear to be met, at a minimum, where a person's Sixth Amendment right to counsel has been deemed to attach: once "judicial proceedings have been initiated against him—'whether by way of formal charge, preliminary hearing, indictment, information or arraignment.'" *Brewer* v. *Williams, supra*, 430 U.S. at 398, *quoting Kirby* v. *Illinois*, 406 U.S. 682, 689 (1972).

While no bar association has ruled on the scope of DR 7-104 in preindictment situations, several opinions make clear that the rule applies in civil matters prior to the filing of a formal law suit. *See, e.g.*, New York City Bar Ass'n Op. No. 101 (1928-29); ABA Informal Op. No. 524 (1962); Note, *supra* note 17, at 1028 (rule should apply to pending litigation or issue likely to lead to litigation). Furthermore, the proposed revision of the Code makes clear that the rule would apply when no litigation is pending. It includes the prohibition on contacts in two separate sections, one dealing with the lawyer as advocate and the other with the lawyer as negotiator. The latter category sets standards for lawyers settling disputes, organizing an enterprise, concluding a contract, negotiating a labor matter, and representing a client before a government regulatory body. *See ABA Commission on Evaluation of Professional Standards, Model rules of Professional Conduct*, rule 3.2(b)(5), 4.2(c)(2) (Draft, Jan. 30, 1980).

The analysis is more complex in the criminal area. Arguably, the purpose of the rule would be served if DR 7-104 were interpreted to apply late in the investigative stage where a person has been identified as a target. At the point that the process shifts from investigatory to accusatory, one of the government's primary interests becomes eliciting incriminating statements from a putative defendant. *Cf. Escobedo* v. *Illinois*, 378 U.S. 478, 492 (1964). Any earlier application of the rule, however, would be likely to impede legitimate investigative activities and thus run counter to the strong public interest in thorough law enforcement.[21] Thus courts have generally adopted the analysis of the

---

[21] *See Lee* v. *United States*, 322 F.2d 770, 776 (5th Cir. 1963):

> Police must be given considerable latitude in questioning suspects and witnesses when an effort is being made to determine whether there is probable cause to believe that a crime has been committed. But the situation is vastly different after a suspect has been formally indicted for a crime. The urgency disappears.

early denial-of-counsel cases, suggesting that contacts violate the rule only once the process has shifted from investigatory to accusatory. *See Clifton* v. *United States,* 341 F.2d 649, 652 n.9 (5th Cir. 1965); *Nai Cheng Chen* v. *INS, supra,* 537 F.2d 566 (contrasting questioning by INS agent at immigrant's home with obtaining statements in a criminal case after a formal filing).[22]

The applicability of DR 7-104 to pre-indictment situations was extensively considered by the District of Columbia Circuit in *United States* v. *Lemonakis,* 485 F.2d 941 (D.C. Cir. 1973), *cert. denied,* 415 U.S. 989 (1974). That case concerned an investigation by the District of Columbia police of a number of similar Georgetown burglaries. An ex-policeman, involved in the burglary ring, turned himself in at the U.S. Attorney's office and sought immunity. He agreed to have his telephone and face-to-face conversations with other suspects in the investigation recorded, both before and after the suspects had retained lawyers and had been subpoenaed to testify before the grand jury investigating the burglaries. On appeal after conviction, the defendants asserted that the undercover investigation conducted by the police violated their Sixth Amendment rights and constituted unethical conduct. Lemonakis also pointed out that his attorney had expressly informed authorities that he would make no statement before the grand jury. The court rejected the Sixth Amendment claim on the ground that, under the Supreme court precedent, the pre-indictment surveillance was not a "critical stage" in the criminal process to which the right to counsel attached.

The court further found "the actions of the U.S. Attorneys to be consistent with the current ethical standards demanded of the legal profession." 485 F.2d at 955. The court's reasons were three-fold. First, the AUSA's instructions to the informant did not convert the informant into an "alter ego" of the prosecutor, which would raise the danger of the suspect being tricked by a lawyer into giving away his case.[23] Second, the court held that "in the investigatory stage of the case, the contours of the 'subject matter of the representation' by appellants' attorneys, concerning which the code bars 'communication,' were less certain and thus even less susceptible to the damage of 'artful' legal questions the Code provisions appear designed in part to avoid." Third, the court found that the public interest in criminal investigation warranted use of statements made by a wrongdoer to an undercover agent. The court specifically contrasted "the different interests involved in civil matters." *Id.* at 956.

---

[22] *See also United States* v. *Turkish,* 470 F. Supp. 903, 910 n.8 (S.D.N.Y. 1978) (where potential conflict of interest exists due to joint representation of subjects of investigation, AUSA should raise question with attorney or with clients directly; although contact with clients should take place in presence of attorney, direct contact with client should "fall within an exception to the prohibition of DR 7-104").

[23] The court distinguished the surveillance in *Massiah* as occurring after indictment.

Because none of the reasons supplied by the court for distinguishing usual applications of DR 7-104 is persuasive under the particular facts of the case,[24] the *Lemonakis* opinion must be viewed as a statement of the inappropriateness of extending the rule into the pre-indictment stage.[25]

The only other case to discuss at length the role of DR 7-104 in investigations is *In re FMC Corp.*, 430 F. Supp. 1108 (S.D. W.Va. 1977). That case involved a joint EPA-U.S. Attorney criminal investigation of a corporation. FMC objected to interviews of its employees by federal investigators without the prior consent of FMC counsel. The question before the court was which of the corporation's officers and employees should be deemed "parties" within the rule so as to require the consent of FMC counsel before the government could interview them. The court held that the procedures adopted by the government met the rule's ethical obligations: federal attorneys and investigators identified themselves and advised the interviewee that he could have an attorney present during the interview and could contact FMC's corporate counsel. *Id.* at 1111.

The court's decision is important for two reasons. First, it assumes that DR 7-104 applies to interviews conducted in the investigatory stages of a criminal case. Second, it recognizes that the ethical obligations of government attorneys could be satisfied with less than absolute compliance with the rule: *i.e.,* the government attorneys and investigators could interview employees without prior notice to FMC counsel. The court specifically noted:

> in exercising [the court's] supervisory power, the canons enjoy great weight in the court's assessment of whether appropriate standards are being observed by lawyers in the course of their practice within the jurisdiction of the court. The canons are themselves the product of experi-

---

[24] Clearly, the acts of the informant were directed and sanctioned by the AUSA, and the incriminating evidence obtained was as damaging as that obtained in *Massiah*. The distinction drawn between contact by the AUSA and the informant is also unsatisfactory because DR 7-104 prohibits an attorney from communicating directly with a represented opposing party and from "caus[ing] another to communicate." Moreover, the AUSA was on notice of Lemonakis' representation and of the fact that he did not wish to make a statement to the grand jury. Finally, the subject matter of the attorney's representation—the investigation of the burglaries—was obvious since Lemonakis had been contacted about the investigation and subpoenaed by the grand jury.

[25] It is possible to restrict *Lemonakis* to situations involving undercover surveillance. A footnote in the opinion distinguishes other cases which evidenced "custodial or post-indictment questioning of a criminal suspect" involving "undisguised Government inquiries pressed by official members of the prosecutorial effort at a point in time when their questions would be sharpened by the factual posture of the case against the suspect." *Id.* at 955 n.23. This suggests that the court might have ruled differently had the AUSA, pre-indictment, contacted the suspect directly without notifying counsel. *See United States* v. *Weiss,* 599 F.2d 730, 740 (5th Cir. 1979) (Strike Force attorneys "flirted with" violation of DR 7-104 by approaching represented target just prior to seeking indictment). Other cases have criticized on ethical grounds post-arrest but pre-indictment interviews of represented persons. *See United States* v. *Thomas, supra,* 474 F.2d 110; *United States* v. *Howard,* 426 F. Supp. 1067, 1071-72 (W.D.N.Y. 1977). But *Lemonakis,* at the least, recognizes that the public interest in effective law enforcement should, to some extent, limit the rule's applicability in investigative activities.

ence gained over the decades, even the centuries, and are designed to establish and assure standards of simple fairness and moral and ethical responsibility on the part of counsel in furtherance of the ends of justice.

*Yet, the court must look beyond the canons in order to preserve a reasonable balance between the exaction of ethical conduct from its lawyer members on the one hand and the search for truth in the administration of justice on the other.* Woods v. *Covington County Bank,* 537 F.2d 804, 810 (5th Cir. 1976). Especially is this the case where the canons and the disciplinary rules promulgated by the bar thereunder are either vague or altogether lacking.

*Id.* at 1110 (emphasis added).[26]

In summary, it seems clear that DR 7-104, assuming it applies to criminal matters, logically applies to all situations in which the defendant or putative defendant has a Sixth Amendment right to counsel. The rule also would logically apply once the criminal process has shifted from investigatory to accusatory, *e.g.,* post-arrest, and perhaps even to investigatory interviews of represented targets by government lawyers.[27] However, courts appear reluctant to fetter legitimate and traditional activities of law enforcement officials in the investigative stage of a case;[28] they tend to invoke the public interest in effective investigation to override the literal meaning of the rule.[29]

## 2. "On the Subject of the Representation"

DR 7-104 prohibits an attorney from contacting an opposing party "on the subject of [his] representation" without the prior consent of the attorney retained by the party "in that matter." This language is important because it appears to permit a broad range of contacts with represented persons, even those who have been indicted. The fact that a person has retained counsel to represent him on one criminal charge would not prohibit interviews concerning unrelated matters.

This view has received general approval by the courts in cases considering a defendant's Sixth Amendment right to counsel: government agents or attorneys may interview persons against whom formal criminal charges are pending if the interview concerns different crimi-

---

[26] *See also Wyatt* v. *Hardin,* Civ. No. 3195-N (M.D. Ala.), Order of June 21, 1978, permitting government attorneys to tour Alabama State mental institutions and interview all personnel without notice to defense counsel. *But cf.* Note, *supra* note 17, at 1022 n.53.

[27] *See United States* v. *Weiss, supra,* 599 F.2d at 740 (Strike Force attorneys "flirted with" violations of Canons of Ethics by approaching target they knew to be represented "when they were about to seek an indictment against him").

[28] *Cf. United States* v. *Massiah,* 307 F.2d 62, 67 (2d Cir. 1962), *rev'd,* 377 U.S. 201 (1964) ("Those who are engaged in the difficult and dangerous business of investigating illegal dealing in narcotics should not be deprived of any reasonable means of securing evidence.")

[29] Of course, these courts do not decide what action a state bar association might take in disciplining an attorney deemed to have violated the rule.

589

nal matters.[30] Under Sixth Amendment analysis, the right to counsel on the charge being investigated will not have attached if there has been no indictment or other initiation of formal proceedings, irrespective of the fact that the person stands indicted on another charge for which he has retained counsel.

The ethical question has received less attention from the courts. Interviews of indicted defendants on unrelated matters seem permissible under the plain words of the rule; however, at least one court has expressed, *in dicta,* its "unease" with the practice, citing DR 7-104. *United States* v. *Crook,* 502 F.2d 1378, 1380 (3d Cir. 1974), *cert. denied,* 419 U.S. 1123 (1975). Such concern could be based on the inherently coercive atmosphere of in-jail interviews, even on unrelated charges, as well as the potential for interviews to stray toward discussion of the charge for which the person has been indicted.

But we believe the better view is represented by the Second Circuit's opinion in *United States* v. *Masullo,* 489 F.2d 217 (2d Cir. 1973). In that case, the defendant was arrested upon leaving the office of an attorney representing him on a state narcotics charge. Although the agents were aware that Masullo had retained counsel in the state matter, he was interviewed concerning federal charges for which he had not yet been arraigned. The court rejected the defendant's claim that the interview without notice to counsel retained on the state charge violated the Sixth Amendment or the government's ethical obligations. The court held that the right to counsel had not attached on the federal charge, nor had counsel been retained on that charge. The court went on to state:

> The concept that professional criminals have "house counsel" because of prior escapades and that therefore government agents knowing the identity of prior counsel have an obligation of constitutional or even ethical dimension to contact counsel before questioning them is hardly appealing . . . . Those who have no "regular" counsel and no means to retain counsel would seem to be more deserving of our solicitude.

*Id.* at 223-24.

Separate problems are raised where no criminal charges are pending but a person has let it be known that a particular lawyer handles all his criminal matters; or where a criminal enterprise has designated a particular attorney as lawyer for all of the organization's members. (The latter example raises the possibility that the lawyer may have greater

---

[30] *See Hoffa* v. *United States,* 385 U.S. 293 (1966) (no unconstitutional denial of counsel where informant hears indicted defendant discussing jury tampering; incriminating statements used in subsequent prosecution and not in the proceeding based on the first indictment); *United States* v. *Dority,* 487 F.2d 846 (6th Cir. 1973); *United States* v. *Osser,* 483 F.2d 727, 733-34 (3d Cir.), *cert. denied,* 414 U.S. 1028 (1973).

allegiance to the welfare of the enterprise than to the welfare of its members.) No cases or bar association opinions discuss whether the rule requires government attorneys or investigators to seek approval from such "house counsel" prior to contacting possible witnesses, subjects, or targets.

We believe the rule could be read not to apply in the early stages of an investigation if the actual charges to be filed are unclear and the persons who may be charged have not designated the attorney to work on any particular charge.[31] Certainly no court would, under existing case law, hold that contacts under these circumstances would violate the Sixth Amendment. It seems obvious to us that extension of DR 7–104 to such situations could severely hamper federal law enforcement.

As the investigation becomes focused on subjects and targets and the nature of the charges becomes clearer, the rule could come into play. If the investigation becomes known because of grand jury proceedings and an attorney has informed the government that his client should not be interviewed, then it may be fairly said that the attorney has been retained for the matter under investigation.[32]

3. "Authorized by Law"

We have discussed above the "authorized by law" exception and our conclusion that federal law enforcement activities taken pursuant to 28 U.S.C. § 533 are exempt from the rule's purview. *See* pages 7–10 *supra.* The "authorized-by-law" exception may also permit contacts if a defendant affirmatively seeks out a government attorney. The Solicitor General has recently taken the position that a defendant's "constitutional right to act on his own behalf in communicating with the government," *Faretta* v. *California,* 422 U.S. 806 (1975), "would be of little value if that official were ethically bound to decline to listen." *Partin* v. *United States, ·Brief in Opposition, supra,* at 23. Thus, the brief argues, the Constitution authorizes, and may arguably require, the government to listen if the defendant initiates the communication in the absence of his attorney.

---

[31] One commentary has reached a similar conclusion in addressing the applicability of DR 7–104 to contacts by private attorneys of government officials. Since government officials are technically at all times represented by government counsel, the rule could be read to prohibit all contacts. The commentator argues that that interpretation is unnecessarily overbroad and that DR 7–104 should come into play only after the government has sought legal assistance on a matter. Until government counsel has been contacted about a particular dispute, the government cannot be said to be represented "in that matter." Note, *supra,* note 17, at 1031–32. *See* D.C. Bar Op. No. 80 (1979) (rule restricts communications with government officials only when subject matter has "been specifically entrusted to a designated" attorney).

[32] The conclusion that, under these circumstances, the communication would be deemed to have concerned the "subject mattter.of the representation" does not end the discussion of the rule's applicability. As discussed above, courts have held that the public interest in federal law enforcement may take precedence over DR 7–104 in some situations, *see Lemonakis* v. *United States, supra,* 485 F.2d at 956 or, alternatives to the rule may be devised that adequately protect the interests of the client. *See, e.g., In re FMC, supra,* 430 F. Supp. 1108.

## B. Waiver of DR 7-104

By its terms, DR 7-104 is an absolute bar against conversations with an opposing party without the consent of the party's attorney (except where communication is authorized by law). Assuming its applicability to criminal and civil law enforcement, the question arises whether the protection of DR 7-104 can be waived. Two types of waiver situations are readily apparent: (1) a government agent or attorney initiates the contact and obtains a waiver of counsel from the opposing party; (2) the defendant affirmatively seeks out a government agent or attorney and indicates that his lawyer should not be present at, or informed of, the meeting. Courts have almost uniformly condemned government-initiated contacts, even though they recognize that a person may waive his constitutional right to counsel. Courts have tended to find no ethical violation occurs where the party initiates the communication.

### 1. Government-Initiated Contacts

If the government knows that an opposing party has retained an attorney for a pending or imminent criminal charge, the express words of DR 7-104 forbid contact with the party without the consent of the party's attorney. However, law enforcement officials—who are usually not attorneys and often unaware of DR 7-104—commonly seek to interview persons after arraignment or indictment without the presence of counsel. While *Massiah* contains language that arguably condemns all post-indictment interviews without counsel present, most courts of appeals have held that the constitutional right to presence of counsel may be waived. *See, e.g., United States* v. *Rodriguez-Gastelum,* 569 F.2d 482 (9th Cir.) *(en banc), cert. denied,* 436 U.S. 919 (1978); *United States* v. *Cobbs,* 481 F.2d 196 (3d Cir. 1973), *cert. denied,* 414 U.S. 980 (1973); *Coughlan* v. *United States, supra,* 391 F.2d at 372 (rejecting claim that Sixth Amendment right to counsel may be waived only with counsel present). *But see United States* v. *Thomas, supra,* 474 F.2d 110.[33] These cases are consistent with and supported by the Supreme Court's decision in *Brewer* v. *Williams, supra.* In *Brewer* the Court found a violation of *Massiah* but stated:

> The Court of Appeals did not hold, nor do we, that under
> the circumstances of this case Williams *could not,* without

---

[33] The courts have generally adopted the *Johnson* v. *Zerbst,* 304 U.S. 458 (1938), waiver standard: a knowing and intelligent relinquishment of a known constitutional right. However, the cases are confused as to whether the waiver of *Miranda* rights constitutes a *Johnson* type waiver of Sixth Amendment rights. The Second Circuit has held that waiver of the right to counsel requires more than the sometimes perfunctory waiver of *Miranda* rights. *See United States* v. *Satterfield,* 558 F.2d 655 (2d Cir. 1976), *aff'g* 417 F. Supp. 293 (S.D.N.Y. 1976) (requiring a *Faretta* type waiver). Justice Blackmun has stated in a concurring opinion that the standard waiver for *Miranda* rights is not adequate for a waiver of the right to counsel, which requires a *Johnson* waiver. *North Carolina* v. *Butler,* 441 U.S. 369, 376–77 (1979) (Blackmun, J., concurring). The majority in that case, however, appeared to equate a *Miranda* waiver with a *Johnson* waiver. 414 U.S. at 374–75.

> notice to counsel, have waived his rights under the Sixth
> and Fourteenth Amendments. It only held, as do we, that
> he did not.

430 U.S. at 405-06 (emphasis in original; footnote omitted).[34] *But see Hancock* v. *White,* 378 F.2d 479, 482 (1st Cir. 1967).

But recognition of the ability of a defendant to waive the constitutional right to counsel does not necessarily imply that government officials may, consistent with DR 7-104, affirmatively seek that waiver. Courts have taken the position that if an FBI agent or AUSA initiates the contact, he has acted unethically even if a waiver sufficient for constitutional purposes has been obtained.[35] *See also* ABA Formal Op. 108 (1934) (plaintiff's attorney may not interview defendant absent defendant's counsel even if defendant is willing to discuss facts of the case).

Several courts have objected quite strongly to such conduct. In *United States* v. *Thomas, supra,* 474 F.2d 110, the Tenth Circuit, *in dictum,* indicated that it would apply an exclusionary rule prohibiting the use of any statement obtained in violation of the rule, irrespective of whether the defendant's constitutional rights have been violated:

> [O]nce a criminal defendant has either retained an attorney or had an attorney appointed for him by the court, any statement obtained by interview from such defendant may not be offered in evidence for any purpose unless the accused's attorney was notified of the interview which produced the statement and was given a reasonable opportunity to be present. To hold otherwise, we think, would be to overlook conduct which violated both the letter and the spirit of the canons of ethics. This is obviously not something which the defendant alone can waive.

---

[34] A conflict presently exists in the circuits as to whether a defendant who has initially requested the presence of an attorney may thereafter waive his right and be questioned without the aid of an attorney. *Compare United States* v. *Grant,* 549 F.2d 942 (4th Cir.), *cert. denied,* 432 U.S. 908 (1977), *and United States* v. *Tafoya,* 459 F.2d 424, 427 (10th Cir. 1972) *with Nash* v. *Estelle,* 597 F.2d 513, 517 (5th Cir. 1979) *(en banc), and White* v. *Finkbeiner,* 570 F.2d 194, 200-201 n.3 (7th Cir. 1978). Courts holding that no subsequent waiver is possible without an attorney present rely upon dicta in *Michigan* v. *Mosley,* 423 U.S. 96, 104 n.10 (1975) (holding that defendant may subsequently waive Fifth Amendment right after an initial refusal to answer questions, but distinguishing situation where defendant initially requests the presence of an attorney). Justice White's concurring opinion in *Mosley* makes a similar distinction. *Id.* at 110. *See generally* Case Note, *Fifth Amendment. Confessions. Self-Incrimination—Does a Request for Counsel Prohibit a Subsequent Waiver of Miranda Prior to the Presence of Counsel?,* 23 Wayne L. Rev. 1321 (1977).

[35] *See United States* v. *Crook, supra,* 502 F.2d at 1380; *United States* v. *Cobbs, supra,* 481 F.2d 196; *United States* v. *Thomas, supra,* 474 F.2d 110; *United States* v. *Four Star,* 428 F.2d 1406, 1407 (9th Cir.) *(per curiam), cert. denied,* 400 U.S. 947 (1970); *Wilson* v. *United States,* 398 F.2d 331, 333 (5th Cir. 1968) *(per curiam), cert. denied,* 393 U.S. 1069 (1969).

474 F.2d at 112. Other circuits, without indicating an intention to adopt an exclusionary rule, have criticized the practice of seeking waiver. In *United States* v. *Four Star, supra,* the Ninth Circuit stated:

> We emphatically reiterate, . . . that in-custody interrogation of an accused person known to be represented by counsel without affording counsel an opportunity to be present is undesirable . . . , and that a prosecuting attorney who knowingly participates in such an interrogation or takes advantage of its results violates professional ethics.

428 F.2d at 1407.[36]

## 2. Party-Initiated Contacts

DR 7-104 does not address situations in which persons affirmatively seek out government agents or attorneys. If the rule were read paternalistically—that is, that only lawyers can protect clients from making foolish or damaging statements—then even in those circumstances the government official would be required to contact the party's attorney before communicating with his client.[37] Courts, however, have been reluctant to condemn party-initiated communications, generally upon the ground that such contacts are voluntary, usually non-custodial and unlikely to be coercive. Thus, the dangers that the rule seeks to protect against, such as attorney trickery, are thought to be minimal.

Illustrative of this attitude is *United States* v. *Monti,* 557 F.2d 899 (1st Cir. 1977). The defendant was arrested for counterfeiting, and was arraigned and jailed. He was unable to meet bail. While in jail and after unsuccessfully attempting to retain counsel, he contacted a Secret Service agent and asked him to come to the jail. The agent did so, and after he gave Monti *Miranda* warnings, Monti indicated a desire to cooperate. Monti subsequently had counsel appointed and was released on his own recognizance. Shortly after meeting with his court-appointed

[36] Courts have been less likely to chastise government-initiated contacts where the party's lawyer may have a conflict of interest in the case. In *United States* v. *Weiss, supra,* 599 F.2d at 730, Weiss had been indicted on state charges of receipt of stolen property and was being investigated for violations of federal firearms law. Weiss attempted to bribe an Atlanta police officer, who was wired by the FBI. Nine days before the federal indictment came down, FBI agents confronted Weiss with tapes and photographs and sought his cooperation. The agents stated that he could consult with his state attorney, but that it might not be in his interest to do so. Weiss subsequently met with a Strike Force attorney. On appeal he sought to enforce an alleged promise not to prosecute and claimed that the government had interfered with his right to counsel. The court rejected both claims. While it stated that the Strike Force attorney "flirted" with violation of DR 7-104, it recited the district court's finding that Weiss' state attorney was a target of the Strike Force investigation and also represented potential witnesses against Weiss; thus an actual conflict of interest existed. Under the circumstances the court did not believe that the government's conduct warranted reversal, particularly where no evidence obtained at the meetings was used at trial.

[37] *See* Michigan Bar Op. No. 202 (1965) (criminal case); ABA Formal Op. 108 (1934) (civil case); *People* v. *Patterson,* 198 N.W. 2d 175, 178-83 (Ct. App. Mich. 1971) (Levin, P.J., dissenting).

counsel, he met with Secret Service agents, who again gave him *Miranda* warnings. Monti made a derogatory comment about his court-appointed lawyer and stated that he was not going to tell his lawyer anything. He then made incriminating statements which were used against him at the trial.

The Court of Appeals held that Monti had waived his right to counsel, and then dismissed Monti's DR 7-104 claim as follows:

> Although other courts have commented on the ethical considerations involved in questioning a defendant without counsel present, *United States* v. *Cobbs*, 481 F.2d 196 (3d Cir. 1973), *cert. denied*, 414 U.S. 980 (1973); *United States* v. *Thomas*, 474 F.2d 110 (10th Cir. 1973), *cert. denied*, 412 U.S. 932 (1973), we agree with the District Court that such considerations do not warrant the exclusion of the . . . statements herein. Those statements were not the equivalent of a guilty plea in court. Where, as here, defendant clearly and unequivocally evidenced his desire *not* to have counsel present at a self-initiated, non-custodial meeting, it would have served no useful purpose to have suppressed statements made at that meeting on the ground of counsel's absence.

557 F.2d at 904 (emphasis in original).

Other courts have reached a similar conclusion under various factual situations if the defendant initiated the contact with the government. *See United States* v. *Thomas*, 475 F.2d 115 (10th Cir. 1973); *Reinke* v. *United States*, 405 F.2d 228 (9th Cir. 1968); *United States* v. *Hale*, 397 F.2d 427 (7th Cir. 1968), *cert. denied*, 393 U.S. 1067 (1969) (lawyer told police that defendant wished to cooperate).[38]

At least one court, however, has indicated that even if the government does not initiate the contact, the better practice is not to communicate with a defendant without a lawyer being present. In *United States* v. *Woods*, 544 F.2d 242 (6th Cir. 1976), the wife of one of the defendants in a complex drug conspiracy case arranged a meeting between an agent and her husband to discuss immunity. An AUSA attended the meeting at which the defendant's role in the conspiracy was detailed, but no attempt was made to contact his attorney, who also represented other defendants in the case. The court, per Judge

---

[38] *But see United States* v. *Partin, supra,* 601 F.2d at 1005 (violation of DR 7-104 where convicted co-defendant seeks out AUSA with offer of cooperation and requests that his cooperation be kept secret out of fear for his physical safety); *United States* v. *Thomas, supra,* 474 F.2d at 111 (violation of DR 7-104 even though "not disputed that the interview was requested by appellant and that appellant read and signed a *Miranda* type waiver of rights form"); *Clifton* v. *United States, supra,* 341 F.2d at 652 (violation of old Canon 9 to talk with incarcerated arrestee where he is young and unschooled even though he initiated contact with FBI).

McCree, held that the occurrence of the meeting did not constitute reversible error:

> Of course, as a general matter, an attorney should not communicate directly with a party whom he knows to be represented by an attorney without the consent of the lawyer. *See* American Bar Association Code of Professional Responsibility, Canon 7, DR 7-104(a)(1). Here, however, the meeting was arranged primarily between government agents and [defendant's wife], who was not under indictment. The government did not seek the meeting. Government attorney Wampler testified that he believed that [the defendant] particularly wanted to keep his attempts to secure immunity from the other defendants and the counsel who represented them all jointly. *Cf. Arrington* v. *Maxwell,* 409 F.2d 849, 853 (6th Cir. 1969).

544 F.2d at 255. The court went on to state:

> However, the government did not take the precautions that were possible. It did not encourage or even suggest to [the defendant] that he should either notify [his attorney] or arrange for the appointment of independent counsel who could be present. Although we disapprove of this practice, it bears little resemblance to the outrageous prosecutorial conduct which required reversal in cases cited by appellants.

*Id. See also* Michigan State Bar Op. No. 202 (1965) (where defendant seeks interview and fears notice to counsel, prosecutor should approach the court and ask for instructions).

To summarize, courts have taken the position generally that waiver of one's constitutional right to counsel does not negate the ethical obligation of a government attorney to seek the consent of an opposing party's attorney before initiating communication with the party. If the party initiates the contact and the circumstances demonstrate that his present counsel is either not wanted by the party or may have a conflict of interest, then courts are less likely to characterize the communications as unethical. However, at least one court has suggested that even in the latter situations, the best course of action would be to advise the person to seek new counsel.

*C. Disaggregating the Prosecution Team*

In response to the *Partin* decision, the San Francisco FBI office has suggested that a uniform FBI policy should be adopted, consistent with the Constitution, under which agents will not inform an AUSA of a proposed contact with a represented person until absolutely necessary. The assumption is that if the AUSA does not know that an agent intends such a communication, the AUSA would not be compelled to notify opposing counsel.

We do not believe that an attempt to disaggregate the prosecutorial team by insulating AUSAs from planned interviews with represented targets or defendants will necessarily protect prosecutions from criticism by the courts. We recognize that some cases have suggested that, whatever the relevance of the Canons of Ethics to the activities of government attorneys, they do not control the conduct of government agents. Usually cited for this proposition is the Second Circuit's opinion in *United States* v. *Massiah,* 307 F.2d 62, 66 (2d Cir. 1962), *rev'd,* 377 U.S. 201 (1964).[39]

Justice White's dissenting opinion in *Massiah* also states that the conduct of the investigators in that case did not violate ethical standards which apply solely to attorneys. He asserted that the purpose of the rule, to protect parties from artful attorneys, is not served by prohibiting a co-defendant, non-lawyer informant from speaking with another defendant without notice to that defendant's attorney. *See also United States* v. *Lemonakis, supra,* 485 F.2d at 956 (government instructions to wired informant did not render informant "alter ego" of U.S. Attorney's office).

Justice White's position may have much to commend it, at least as regards questioning by informants. Courts have, however, refused to view agent contacts as separate from the AUSA's conduct of a case. *See, e.g., Clifton* v. *United States, supra,* 341 F.2d at 652 n.9 (although FBI agents may not be lawyers, once process shifts from investigation to accusation, DR 7-104 applies); *Schantz* v. *Eyman,* 418 F.2d 11 (9th Cir. 1969), *cert. denied,* 397 U.S. 1021 (1970) (district attorney sends psychiatrist to home of defendant who is pleading insanity defense; gross violation of professional ethics); *United States* v. *Howard, supra,* 426 F. Supp. at 1071 (questioning by agent viewed as government conduct violating DR 7-104); *United States* v. *Wedra,* 343 F. Supp. 1183, 1188 (S.D.N.Y. 1972) (Weinfeld, J.) (suppressing testimony based on agent interview that would have violated DR 7-104 if conducted by AUSA).[40] No court has excused an interview of a represented party on the basis that it was conducted by an agent and not an AUSA. *See United States* v. *Brown,* 569 F.2d 236, 249 (5th Cir. 1978) (Simpson, J., dissenting).

This view is supported by interpretations of the Code. *See* ABA Formal Op. No. 95 (1933) (police officers may not, at behest of municipal attorney, obtain statements from personal injury claimants); ABA Informal Op. No. 663 (1963) (unethical for defense attorney to engage

---

[39] However, even that opinion recognizes that DR 7-104 would prohibit "an investigator's acting as the prosecuting attorney's alter ego." 307 F.2d at 66.

[40] *See also Coughlan* v. *United States, supra,* 391 F.2d at 376 (Hamley, J., dissenting):
   While [DR 7-104] does not purport to govern the conduct of non-lawyers, such as the interrogating officers in this case, it does place a responsibility upon prosecuting lawyers not to sanction, or take advantage of, statements obtained by government agents from a person represented by counsel, in the absence of such counsel.

undercover investigator to discover physical and mental state of plaintiff in medical malpractice case). It is also supported by the ABA's Preliminary Statement preceding the Canons, which reads:

> Obviously the Canons, Ethical, Considerations, and Disciplinary Rules cannot apply to non-lawyers; however, they do define the type of ethical conduct that the public has a right to expect not only of lawyers but also of their non-professional employees and associates in all matters pertaining to professional employment. A lawyer should ultimately be responsible for the conduct of his employees and associates in the course of the professional representation of the client.

Thus, it appears that bar associations may well attempt to hold AUSAs responsible for the conduct of agents involved in a prosecution they are directing.[41]

We believe that disaggregating the AUSA from his investigators has very little to commend it as a matter of policy. First, such an approach is likely to cut down on communications between AUSAs and FBI agents which play a vital role in the investigatory process. Second, we believe that the Attorney General's power to establish ground rules in this area should not be exercised in such a fashion as to create at least the appearance of a "double standard" within the Department of Justice absent some compelling interest in doing so.[42]

## V. Sanctions

The preceding discussion assumes that DR 7-104 will be deemed applicable to most situations involving government contact with represented parties in criminal matters. This raises the question of what sanctions could be imposed on the government or a government attorney or agent for violation of the rule. There appear to be three: (1) exclusion of evidence; (2) dismissal of the indictment, or reversal of conviction; and (3) state bar disciplinary proceedings.

### A. Exclusion of Evidence

As noted above, the Tenth Circuit announced *in dictum* a prospective exclusionary rule for evidence obtained in violation of DR 7-104 in *United States* v. *Thomas, supra,* 474 F.2d 110. No subsequent opinion from that Circuit has applied the rule, although it has been reaffirmed *in dicta, United States* v. *Lebya,* 504 F.2d 441, 443 (10th Cir. 1974), *cert.*

---

[41] As discussed below, a state bar disciplinary proceeding was begun against an AUSA where he did not encourage, direct, or request FBI agents to interview the defendant, although he had been present at a discussion where the possibility of such contact was raised. *In the Matter of Rosen,* Certified Report of Wayne County Hearing Panel #15 of the Attorney Discipline Board, File No. 35019-A (Mich. Attorney Discipline Bd., Dec. 27, 1978).

[42] Such a policy also would not protect FBI agents who are attorneys and members of state bars.

598

*denied,* 420 U.S. 934 (1975) and distinguished elsewhere. *United States v. Thomas,* 475 F.2d 115 (10th Cir. 1973) (defendant, in presence of U.S. Marshals, volunteers statement; exclusion not required since not a product of an uncounseled, in-custody interview). Two other cases have held that evidence obtained in violation of DR 7-104 is inadmissible, although in each a constitutional violation was found as well. In *Schantz* v. *Eyman, supra,* 418 F.2d at 71, a state habeas corpus case, the court found a gross violation of professional ethics where a district attorney had sent a psychiatrist to the home of a defendant who was pleading an insanity defense. In *United States* v. *Wedra, supra,* the court suppressed statements after finding that the defendant had not adequately waived his right to presence of counsel. The court then added that it would also have suppressed the statements under its supervisory power because of the "unfair and overreaching" nature of the interrogation. 343 F. Supp. at 1188.

The exclusionary sanction may be inefficacious for several reasons. First, appeals courts have generally been unwilling to upset otherwise valid convictions based on overwhelming evidence solely on the ground that evidence obtained unethically was admitted at trial. *See United States* v. *Cobbs, supra,* 481 F.2d at 200; *United States* v. *Springer, supra,* 460 F.2d at 1354; *United States* v. *Smith,* 379 F.2d 628, 633-34 (7th Cir. 1967). Furthermore, the misconduct may not give rise to evidence which the government seeks to introduce at trial.[43] *See, e.g., United States* v. *Woods, supra,* 544 F.2d 242. Finally, a defendant may not have standing to object to evidence obtained during an unethical interview with someone else. *See, e.g., United States* v. *Partin, supra,* 601 F.2d 1001.

More importantly, we do not believe that federal courts have the power to exclude evidence solely on the ground that DR 7-104 was violated. Courts have recognized that suppression of evidence for violation of the rule is an exercise of their "supervisory power," not a constitutional mandate. *See United States* v. *Smith, supra,* 379 F.2d at 633; *United States* v. *Wedra, supra,* 343 F. Supp. at 1188. The origin, nature, and scope of a federal court's "supervisory power" over the administration of justice has never been well defined. *See generally, United States* v. *Payner, Brief for the United States,* at 14-20, Oct. Term, 1979, No. 78-1729 (filed Nov. 1979). It is clear, however, that the power of a federal court "to prescribe rules of procedure and evidence for the Federal courts exists only in the absence of a relevant Act of Congress." *Palermo* v. *United States,* 360 U.S. 343, 353 n.11 (1959);

---

[43] The Tenth Circuit in *United States* v. *Thomas, supra,* recognized that the fruits of misconduct might not be offered into evidence but left to a later day what sanction might be appropriate:

> The enforcement officials are agents of the prosecuting party, and in the event use is made of information secured by interviews [in violation of DR 7-104], short of its introduction in evidence, the problem will be dealt with in the proper case.

474 F.2d at 112.

*accord, United States* v. *National City Lines,* 334 U.S. 573, 589 (1948). *See Sibbach* v. *Wilson & Co.,* 312 U.S. 1, 9–10 (1941) (congressional authority includes power to regulate practices and procedures of federal courts).

Congress has spoken to the admissibility in criminal trials of statements by defendants. In an effort to limit (or overturn) *Miranda,* Congress enacted 28 U.S.C. § 3501(a), which provides that any confession or incriminating statement made by a defendant "shall be admissible in evidence if it is voluntarily given."[44] Excluding a defendant's statement, if voluntarily given, on the ground that the interview of the defendant was unethical would necessarily establish a new ground for exclusion not provided for by Congress. Under these circumstances, exclusion would appear to us to be an improper use of a court's supervisory power. The Third Circuit has so held. *United States* v. *Crook, supra,* 502 F.2d at 1380-81.[45] Other courts have indicated their uneasiness with relying upon their supervisory power to reverse a conviction solely on the ground that defendant's statement, otherwise voluntary, was obtained in violation of DR 7-104. *See, e.g., United States* v. *Smith, supra,* 379 F.2d at 633–34.

The recent draft of a proposed revision of the ABA Code of Professional Responsibility lends support for the inadvisability of excluding evidence for violation of the rule. In its discussion of the Code's "Scope and Definitions," it states:

> [T]he purpose of the Rules can be subverted when used by opposing parties as procedural weapons. The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule.

---

[44] To the extent that § 3501(a) is read to limit the protections afforded by *Miranda,* it is probably unconstitutional. *See, e.g.,* C. *Wright & A. Miller, Federal Practice and Procedure* (Criminal) § 76, (1969). But courts have been adept at avoiding a ruling on the constitutionality of the section. *See, e.g., Ailsworth* v. *United States,* 448 F.2d 439, 441 (9th Cir. 1971).

[45] *United States* v. *Payner, supra,* presents an analogous issue. There the district court, relying on its supervisory power, excluded evidence obtained by an illegal search which the defendant did not have standing to contest. The Supreme Court granted *certiorari* to decide whether the district court possessed, and should have exercised, supervisory power to suppress evidence allegedly obtained as the result of an illegal search that did not violate the defendant's Fourth Amendment rights. The brief for the United States argues that Rule 402 of the Federal Rules of Evidence deems admissible all evidence not obtained in violation of the Constitution or federal law, and since the evidence at issue was obtained without violating the defendant's Fourth Amendment rights, it could not be suppressed under the district court's supervisory power. [NOTE.—The Supreme Court adopted this position, holding that: "the supervisory power does not authorize a federal court to suppress otherwise admissible evidence on the ground that it was seized unlawfully from a third party not before the court." *United States* v. *Payner,* 447 U.S. 727, 735 (1980). Ed.]

## B. Dismissal of Indictments or Reversal of Convictions

If the violation of DR 7-104 does not produce evidence admitted at trial, the defendant usually asks a court to dismiss the indictment or reverse a conviction because of the prosecutor's misconduct. While courts are quick to condemn the government's conduct, they have not, to our knowledge, aborted a prosecution *solely* on the grounds of an ethical violation. *See, e.g., United States* v. *Partin, supra,* 601 F.2d 1000; *United States* v. *Glover, supra,* 596 F.2d 857; *United States* v. *Woods, supra,* 544 F.2d 242. Nor under our analysis above, would federal courts have the power to do so.

## C. Bar Association Proceedings

Whether or not a federal court reverses a conviction because of prosecutorial misconduct, government attorneys whose actions arguably violate DR 7-104 run the risk of state bar disciplinary proceedings.

We are aware of at least one state bar proceeding initiated against an AUSA based upon the complaint of a defendant's attorney charging a violation of DR 7-104. The findings of facts of the Michigan Attorney Discipline Board recite that two FBI agents believed that the attorney of a defendant indicted for conspiracy to escape had been an active participant in the conspiracy. When the agents "mentioned in passing" to the AUSA their intention to contact the defendant regarding the attorney's involvement, the AUSA "questioned the wisdom and fruitfulness of making such a contact." Later, the agents again mentioned to the AUSA that they would contact the defendant; they "did not seek to secure the permission" of the AUSA, nor did the AUSA "encourage, direct or request" the agents to make the contact. However, the AUSA "did not attempt to prevent the contact and did not consult with the Court concerning the possible contact by the Agents." The complaint was dismissed by the Board upon the following Stipulation of Counsel:

> that even in the unusual circumstances of this case, it would have been better practice if [the AUSA] had proceeded with greater caution by taking the initiative to approach the court, note the problem and ask for instructions . . .   .

*In the Matter of Rosen,* Certified Report of Wayne County Hearing Panel #15 of the Attorney Discipline Board, File 35019-A (Dec. 27, 1978). This example makes clear the real threat that state bar disciplinary boards will initiate proceedings for violations of DR 7-104 by federal prosecutors. Even if the board finds for the government, the time spent in defending such actions may be a considerable burden on scarce prosecutorial resources.

A strong, and we believe persuasive, argument may be lodged against any attempt by a state bar association to impose sanctions on a govern-

ment attorney who is acting lawfully and in pursuance of his federal law enforcement responsibilities. It is well established that the Supremacy Clause bars state authorities from regulating the conduct of United States employees in the performance of their official duties in a manner inconsistent with federal law.[46] *See Hancock* v. *Train,* 426 U.S. 167, 178–81 (1976); *In re Neagle,* 135 U.S. 1, 75 (1890); *Clifton* v. *Cox,* 549 F.2d 722 (9th Cir. 1977); *State of Arizona* v. *Manypenny,* 445 F. Supp. 1123 (D. Ariz. 1977). Nor may a state, under the guise of regulating the bar, prohibit a person from performing functions within the scope of federal authority. *See Sperry* v. *Florida,* 373 U.S. 379 (1963) (where Patent Office permits non-lawyers to practice before it, Supremacy Clause prohibits Florida from enjoining such conduct as "unauthorized practice"). Thus, where an FBI agent or AUSA contacts subjects or defendants in furtherance of his federal law enforcement responsibilities, a state bar association may not burden that activity by imposing sanctions.

## VI. Conclusion and Recommendations

The adoption of a Department of Justice policy on DR 7–104 which does not fully satisfy the existing and probable interpretations of the rule would undoubtedly lead to continuing vexatious litigation, confrontation between the Department and certain courts, and nettlesome actions by state bar associations. We are confident, however, that a Department policy reasonably grounded in concerns for vigorous law enforcement, and balanced against the constitutional rights of criminal defendants, would ultimately prevail. Although the choices to be made as a matter of policy are not likely to be easy ones, we believe that the primary legal constraints on the choices available should be viewed, for the present, as constitutional ones.

As we indicated at the outset of this memorandum, and as we had indicated informally in March of 1979, we believe that the involvement of all investigatory and litigating elements in the Department is crucial to the development of sound policy. Although the focus on this effort to date has largely been concentrated in the criminal arena, addressing these issues in the context of purely civil litigation would seem to us to be a logical and necessary step.

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[46] The Department has vigorously asserted this argument in a September 11, 1979 memorandum from Acting Associate Attorney General Shenefield to the District of Columbia Court of Appeals regarding proposed amendments to provisions implementing Canon 9 of the D.C. Bar Code of Professional Responsibility. *See also* Memorandum from then Associate Attorney General Egan to the D.C. Bar Committee on Legal Ethics, April 6, 1979 (regarding proposed amendments to DR 7-104).