UNITED STATES of America, Appellee,

v.

Robert E. MONTI, Defendant, Appellant.

No. 76–1486.

United States Court of Appeals,
First Circuit.

June 24, 1977.

Maurice F. Ford, Dorchester, Mass., by appointment of the Court, for defendant, appellant.

Charles E. Chase, Asst. U. S. Atty., Boston, Mass., with whom James N. Gabriel, U. S. Atty., and Jaye A. Whittier, Asst. U. S. Atty., Boston, Mass., were on brief, for appellee.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, and MARKEY *, Chief Judge.

MARKEY, Chief Judge.

Monti appeals from a conviction on a single-count indictment charging him with selling, transferring and delivering approximately $2,000 (face amount) in counterfeit twenty-dollar Federal Reserve Notes with the intent that they be passed, published and used as true and genuine, in violation of 18 U.S.C. §§ 2, 473 (1970).[1] Monti seeks reversal on the basis of the District Court's denial of his motion to suppress certain inculpatory oral statements made to Secret Service Agents. We affirm.

### The Facts

Following an investigation, agents of the United States Secret Service arrested Monti in Dorchester, Massachusetts, on April 24, 1974. At the time of his arrest, Monti was orally advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Monti was transported to a Cambridge Secret Service office for "processing." Enroute to that office, Monti was again given oral *Miranda* warnings. Upon arrival at that office, *Miranda* warnings were read to Monti from a printed form. Monti then read and signed the form, acknowledging that he understood his rights, but refused to sign the waiver of his rights printed on the lower portion of the form.

\* \* \* \* \* \*

* Of the Court of Customs and Patent Appeals, sitting by designation.

1. § 2. Principals.
   (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
   (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

§ 473. Dealing in counterfeit obligations or securities.
   Whoever buys, sells, exchanges, transfers, receives, or delivers any false, forged, counterfeited, or altered obligation or other security of the United States, with the intent that the same be passed, published, or used as true and genuine, shall be fined not more than $5,000 or imprisoned not more than ten years, or both.

Monti was questioned concerning his dealings in counterfeit money and was advised of the maximum penalty for the charged offense. Additionally, agents indicated to Monti that if he cooperated a recommendation would be made to the United States Attorney that bail be set at an amount which Monti could make.

Making no incriminating statements at that time, Monti asked and received permission to contact his attorney, who was otherwise engaged and could not represent him. A magistrate not being available, Monti was retired to the Charles Street jail.

The following day, April 25, 1974, Monti was arraigned before a Federal Magistrate and bail was set at $25,000. An attorney was not appointed, Monti having indicated his intent to retain counsel himself. Unable to arrange bail, Monti was returned to the Charles Street jail, where he again tried, unsuccessfully, to retain counsel.

On April 26, 1974, Monti telephoned the Secret Service and left a message for Agent Monahan to visit him at the jail. Monahan did so. Prior to any questioning, Agent Monahan again read Monti the *Miranda* warnings and inquired whether Monti had been able to obtain counsel. Monti replied that he had not. Upset because the people with whom he had dealt had not helped him post bail or retain counsel, Monti expressed a desire to cooperate, though he was reluctant to talk in jail for fear of being overheard. In response to a question regarding the source of the counterfeit money, Monti borrowed Agent Monahan's pen, wrote "Al" on his hand and gave the agent Al's telephone number.

On April 29, 1974, Monti was brought before a Federal Magistrate for a bail reduction hearing. Agent Monahan also appeared. The result of that hearing was a reduction of bail to $1,000 without surety,

the appointment of an attorney to represent Monti, and release of Monti on his own recognizance. Monti indicated to Agent Monahan, at that time, that he needed a couple of days on the street, but would then fully cooperate.

On May 2, 1974, Monti met with his court-appointed attorney. Thereafter, Monti telephoned Agent Monahan and arranged a meeting for that afternoon, in the parking lot of Orbit's Department Store in Dorchester. At that meeting, Agents Monahan and Searle met with Monti in Monti's automobile. Though Monti was not in custody at this time and prior to any questioning, Agent Monahan again advised Monti of his rights.[2] Monti began by asking the agents whether they were wired for sound. They replied that they were not.

Agent Monahan asked Monti whether he had talked to his attorney. Monti answered in the affirmative, making a derogatory comment about his court-appointed attorney, with whom he had met just prior to his calling for the meeting. Monti remarked that he was not going to tell his attorney anything. Agent Monahan then asked Monti for everything he knew concerning the sale and distribution of counterfeit currency.

Monti told agents Monahan and Searle that he had personally arranged for over $25,000 in counterfeit bills to pass into circulation. Monti also identified a photograph of Alvin Kaplan as "Al," the source of the counterfeit currency. Monti agreed to introduce Agent Searle to Al for the purpose of purchasing counterfeit currency.

At this point, Monti declared that he wanted to make a "deal," otherwise he would not cooperative further. Agent Monahan advised Monti that no deal could be made; however, his cooperation would

---

2. "Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning. If you cannot afford a lawyer, one will be appointed for you before question-

ing if you wish. If you decide to answer questions now, without a lawyer being present, you will still have the right to stop the questioning at any time until you talk to a lawyer. Do you understand what I have read to you? Having these rights in mind, do you wish to talk to me now?"

be made known to the United States Attorney.

Thereafter, Monti made certain inculpatory statements, the substance of which was that Monti had brought a Richard Patrick O'Brien to Al for the purpose of purchasing a package of $2,000 in counterfeit twenty-dollar bills. O'Brien had been arrested on April 22, 1974, carrying $1,760 in counterfeit twenties. Monti confirmed that the counterfeit currency found on O'Brien was part of that $2,000 package.

Monti telephoned Agent Monahan the next morning, May 3, 1974, to advise that a meeting with Al was being set up and that Monti would telephone later. Monti made no further contact with the Secret Service.

On June 26, 1974, Monti was indicted, as an aider and abettor, for knowingly and willfully selling, transferring and delivering approximately $2,000 (face amount) in counterfeit twenty-dollar Federal Reserve Notes with the intent that they be passed, published and used as true and genuine, in violation of 18 U.S.C. §§ 2, 473.

On August 14, 1974, Monti moved to suppress any statements made to Agents Monahan or Searle after the date of Monti's arrest. Memoranda were filed by Monti and the Government. A hearing was held on February 14, 1975. The District Court issued a memorandum and order on March 28, 1975, in which the motion was granted with respect to statements made in custody prior to May 2, 1974, and denied with respect to the statements of May 2, 1974, the court having found the latter to have been made knowingly, intelligently and voluntarily in a non-custodial setting.

## The Arguments

Monti argues that the statements of May 2nd should have been suppressed because: (1) they were the illegal fruit of his prior suppressed statements, and (2) the evidence did not clearly and convincingly show an intelligent, knowing and voluntary waiver of his right to counsel.

With respect to the first argument, Monti contends that there was no "independent act of a free will," *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963), between the prior suppressed statements and the May 2, 1974, statements, which act might have purged the taint of the prior statements, and in view of *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), that the *Miranda* warnings of May 2, 1974, were by themselves insufficient to have purged that taint.

With respect to the second argument, Monti proceeds on a variety of theories. Initially, Monti contends that his "state of mind" at the May 2nd meeting was that his prior statements had implicated him in the counterfeit scheme; that he had previously agreed to cooperate; and that by obtaining a reduction in bail, agents Monahan and Searle had completed their part of the bargain somehow obligating Monti to fulfill his part of the bargain to cooperate. Secondly, Monti urges that his enquiry whether agents Monahan and Searle were "wired" indicated that he wished to remain silent. Further interrogation, Monti contends, should have been discontinued pursuant to *Miranda*, supra at 473–474, 86 S.Ct. 1602. Thirdly, Monti contends that he was denied right to counsel, citing *Hancock v. White*, 378 F.2d 479 (1st Cir. 1967), for the proposition that the rule of *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), excluding post-indictment inculpatory statements made without counsel, is not limited to deliberately elicited statements but applies to voluntary statements as well. Even if his May 2nd statements were deemed voluntary, Monti argues, *Massiah* and *Hancock* dictate that such statements must be excluded as having been made without benefit of counsel. Citing *United States v. Ash*, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973), Monti says the test of whether his right to counsel has been denied is "whether the accused required aid in coping with legal problems or assistance in meeting his adversary." Under that test, Monti argues, his May 2nd statements should have been excluded because he required legal assistance, i. e., that counsel could have advised him that his

prior statements were suppressible, that he could have bargained to be named an unindicted co-conspirator in exchange for testifying against O'Brien and "Al" and that his May 2nd statements would be tantamount to a confession. Monti urges that his May 2nd statements were the equivalent of a guilty plea in open court and, as such, should not have been accepted without specifically inquiring whether Monti knew the consequences of those statements and of his right to counsel.

### OPINION

The question in *Wong Sun* and *Brown* was whether statements and other evidence obtained after an illegal search or arrest should be excluded as "fruit of the poisonous tree." *Wong Sun* requires that a defendant's statement must be both voluntary and "sufficiently an act of free will to purge the primary taint" of an illegal arrest. *Brown* held *Miranda* warnings per se insufficient to attenuate the primary taint of an illegal arrest. The fact that *Miranda* warnings are given is not unimportant, however. *Brown* requires the further consideration of "temporal proximity of the arrest and the confession, the presence of intervening circumstances * * * and, particularly, the purpose and flagrancy of the official misconduct," 422 U.S. at 603–604, 95 S.Ct. at 2261.

■ Monti presents no issue of illegal search or arrest. His "poisonous tree" is allegedly rooted in the fact of his having made the suppressed statements while in custody. The sole reason for the suppression of his prior statements was the failure of the government to affirmatively show them to have been made freely and voluntarily, and after an effective and knowing waiver of rights. There is no evidence that those prior statements either resulted from overbearing or abusive treatment or were in any way forcefully coerced. Monti, while in custody, was not subjected to treatment calculated to break his will and to obtain an admission only to have a subsequent admission drawn from him in a more polite manner, thus leading to an inference

that his second admission was a product of the first. See *United States v. Gorman*, 355 F.2d 151, 157 (2nd Cir. 1965), *cert. denied,,* 384 U.S. 1024, 86 S.Ct. 1962, 16 L.Ed.2d 1027 (1966). The poison, if poison there was, in the circumstances which caused suppression of the initial statements did not so permeate those of the later statements that the latter must also be suppressed. *Knott v. Howard*, 511 F.2d 1060 (1st Cir. 1975).

■ Moreover, the May 2nd statements were sharply removed in time and place from the prior custodial statements. Monti was no longer in custody. He initialed the meeting with agents Monahan and Searle, and did so after consulting with counsel. Prior to the May 2nd statements, Monti was totally aware of his rights, having already been given *Miranda* warnings at least four times. Even so, Agent Monahan advised Monti on May 2, 1974, of his rights prior to the making of any incriminating statements. There is no allegation that agents Monahan and Searle engaged in any form of misconduct or coercion on May 2, 1974. Monti, not being in custody, was free to stop talking and leave at any time. If any taint attached to Monti's previous statements, it was fully dissipated by the intervening time interval, by Monti's having consulted with counsel in the interim, by the change to a non-custodial setting, by Monti's having urged the meeting, and by the absence of coercion or overbearing conduct on the part of the agents.

■ Monti's "state of mind" argument is without merit. He initiated the May 2nd meeting of his own volition after consulting counsel. He knew his rights, including the right to counsel. He had no reason to think he was under obligation to call for a meeting without counsel. His attempt to deal defeats his claim that he thought he had to cooperate. He continued to make statements *after* being advised that *no deal* could be made. He was neither enticed nor falsely induced to talk, but did so only as a result of his own willingness. His previous statements, limited to writing "Al" on his hand and giving Al's telephone number, could not reasonably have been considered

so completely inculpating that any additional statements would be merely cumulative. His question regarding whether the agents were "wired" indicates a concern that a tape might be used later, but even if that concern be equated to a belief that his statements would not be testified to by the agents, such a mistake of law would be of no avail. Subsequent to asking his question, he proceeded to volunteer information, thus evidencing a clear intention *not* to remain silent. Volition and knowledge must be judged by the totality of the circumstances and outward manifestations. Monti's conduct on May 2, 1974, speaks more loudly than his present words about his intent on that day.

 Although incriminating statements made in the absence of counsel may be suppressible even without any attempt to deliberately elicit incriminating statements, *Massiah, supra; Hancock, supra; Grieco v. Meachum*, 533 F.2d 713 (1st Cir. 1976), *cert. denied, sub nom. Cassesso v. Meachum*, 429 U.S. 858, 97 S.Ct. 158, 50 L.Ed.2d 135 (1976), all such statements made in the absence of counsel are not suppressible.[3]

 The right to counsel can be waived. *United States v. Springer*, 460 F.2d 1344 (7th Cir. 1972), *cert. denied,* 409 U.S. 873, 93 S.Ct. 205, 34 L.Ed.2d 125 (1972), *United States v. Crisp*, 435 F.2d 354 (7th Cir. 1969), *cert. denied,* 402 U.S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 116 (1971). *Miranda* warnings had repeatedly alerted Monti to his right to counsel. He had recently met with counsel. Monti's derogatory comments to the agents about his counsel clearly establish his desire to forego his right to have counsel present at the meeting. The question in *Ash, supra*, was whether the defendant had a right to counsel at a particular stage of criminal proceedings, i. e., a

post-indictment photographic display. There is no doubt that Monti had the right to have counsel present at the May 2nd meeting if he had so desired. It is clear, however, from all the evidence, that Monti knowingly and freely waived his right to counsel.[4]

 Although other courts have commented on the ethical considerations involved in questioning a defendant without counsel present, *United States v. Cobbs*, 481 F.2d 196 (3d Cir. 1973), *cert. denied,* 414 U.S. 980, 94 S.Ct. 298, 38 L.Ed.2d 224 (1973). *United States v. Thomas*, 474 F.2d 110 (10th Cir. 1973), *cert. denied,* 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160 (1973), we agree with the District Court that such considerations do not warrant the exclusion of the May 2nd statements herein. Those statements were not the equivalent of a guilty plea in court. Where, as here, defendant clearly and unequivocally evidenced his desire *not* to have counsel present at a self-initiated, non-custodial meeting, it would have served no useful purpose to have suppressed statements made at that meeting on the ground of counsel's absence.

Accordingly, the judgment of the District Court is affirmed.

---

3. If such were the rule, one who has counsel, with or without counsel's knowledge or instructions, could approach the authorities alone, in an effort to "deal," and then, when things went badly, escape the consequences of his voluntary act by relying on the absence of counsel. We have no reason whatever to believe that counsel was in any manner aware of Monti's May 2, 1974, meeting in this case. The

hypothetical, however, illustrates the wisdom of avoiding a *per se* approach.

4. In *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), the suspect was in custody, had been instructed not to answer questions, was a former mental patient, and was enticed into disclosing the grave of his victim.