Samuel **FUENTES**

v.

John **MORAN, Director Department of Corrections.**

**Civ. A. No. 82–0071S.**

United States District Court, D. Rhode Island.

Sept. 27, 1983.

William Reilly, Public Defender, Paula Rosin, Asst. Public Defender, Providence, R.I., for plaintiff.

Dennis J. Roberts II, Atty. Gen., by Margaret R. Levy, Anthony F. DelBonis, Sp.

Asst. Atty. Gen., Providence, R.I., for defendant.

## OPINION

SELYA, District Judge.

This is an application for a writ of habeas corpus brought pursuant to 28 U.S.C. §§ 2241 and 2254. The petitioner, Samuel Fuentes, is currently incarcerated at the Adult Correctional Institution, Cranston, Rhode Island. The defendant is the director of the state's department of corrections.

This proceeding arose out of a two-count indictment lodged against Fuentes in 1978, charging him with the first-degree murders of Helen Dias and Jane Dias (mother and daughter, respectively). The evidence of guilt can fairly be characterized as overpowering. The petitioner was convicted on all charges in Providence County Superior Court in October of 1978, after trial by jury. He was sentenced to serve two consecutive life terms. His appeal to the Rhode Island Supreme Court proved unavailing. *State v. Fuentes,* 433 A.2d 184 (R.I.1981). The instant application thereupon ensued.

The application was referred to a United States magistrate for consideration pursuant to 28 U.S.C. § 636(b)(1)(B), 28 U.S.C. § 2254 and Rule 10 thereunder. The magistrate, in a lengthy rescript filed on July 22, 1983 (the "Report"), recommended that the writ be granted because the petitioner's Fifth and Sixth Amendment rights had been abridged. The state seasonably objected. Supplemental briefs were filed, and oral arguments were heard by the court on September 14, 1983. Decision was reserved.

### I. *The Factual Predicate*

Collocation of the material facts is essential to an understanding of the issues presented. On or about February 21, 1978, both Jane Dias and her mother, Helen, mysteriously vanished. Providence police were alerted to this circumstance when friends of the family filed missing person reports. After some desultory preliminary investigation, questioning of Marta Carlos took place on March 2, 1978. Ms. Carlos related that Jane Dias had been romantically entangled with Fuentes. She also recounted the circumstances of an encounter which had occurred on February 21, as a result of which Ms. Dias had apparently been placed in fear of Fuentes. Such trepidation was heightened, in the context of this case, by the memory of an earlier vignette wherein Fuentes had allegedly assaulted and beaten Jane Dias.[1] The detectives in charge of the search (Springer and Mitchell) concluded that foul play might be afoot; and that Fuentes in any event ought to be interrogated.

Later that day, Springer and Mitchell accompanied Pawtucket police to a Pawtucket address reputed to be the petitioner's abode. Unable to run Fuentes to ground at that address, the Providence police retreated to their station (having first requested that their Pawtucket counterparts continue the effort to locate Fuentes). Upon their return, Mitchell called Attorney John Ruginski.[2] While Ruginski had represented petitioner in sundry legal matters, the call was placed to his home (not his law office); and the only sensible inference which can be drawn from the record is that Mitchell called Ruginski not in the latter's capacity as counsel for Fuentes, but because Ms. Carlos had informed the police that she had previously enlisted Ruginski's aid in trying to locate Jane Dias. Mitchell was hopeful that Ruginski might, via Fuentes, have unearthed some facts pertinent to the tandem disappearance.[3] Mitchell inquired into the whereabouts of the petitioner and asked Ruginski "to locate Mr. Fuentes and have

---

1. Fuentes was, in early 1978, awaiting trial on criminal charges stemming from this episode.

2. Mitchell had no recollection of the ostensible call. But, while recognizing the shaky factual foundation upon which the petitioner's argument in this regard rests, the court will, for purposes of this opinion, accept *arguendo* Ruginski's testimony as to the call and as to its substance.

3. Ruginski admitted that Ms. Carlos had visited his office in this regard in late February of 1978.

Mr. Fuentes come to the police station". T. 176.[4] Mitchell did tell Ruginski that he was investigating the disappearance of the Dias women, and that he wanted to question Fuentes on this score. Ruginski replied, in substance, that he had asked the petitioner about the disappearance, but that Fuentes had disclaimed all knowledge. Ruginski stated that he would then accede to Mitchell's request if he (Ruginski) was successful in tracking down the petitioner.

The next morning (March 3, 1978), Pawtucket police located and arrested Fuentes, placing him in custody on a preexisting state district court bench warrant for non-payment of a fine in an unrelated proceeding.[5] Since the capias was returnable to the Sixth Division District Court in Providence, Springer was summoned. He went to Pawtucket police headquarters and returned to Providence with Fuentes in tow.

It was mid-day when Fuentes was brought to the police station in Providence. At that time, or shortly thereafter, Springer and Mitchell informed the petitioner that he was a suspect vis-a-vis the disappearance of Ms. Dias and her mother, and properly advised him of his rights as required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The detectives did not discuss the Mitchell-Ruginski dialogue with Fuentes, nor mention any such conversation to him. Likewise, neither Mitchell nor Springer contacted Ruginski to advise him that Fuentes was in custody.

The initial interrogation of the petitioner was not especially fruitful. Petitioner, having waived his *Miranda* rights, disavowed any knowledge of the whereabouts of the Dias women. When Springer suggested that Fuentes had "done away with them", T. 22, Fuentes replied: "You have no proof. You have no corpus delicti". *Id.* With little useful information forthcoming, the Providence police made good-faith efforts to schedule a hearing on the capias at the state district court.[6] Such a session could not then be held, however, due to the vagaries of nature, both climatological and human: it was a Friday afternoon, a snowstorm had been predicted, and the district court was unmanned. Inasmuch as the police were unable to locate a judge, the petitioner remained in custody on the capias. At approximately 3:25 p.m. on March 3, 1978, the petitioner assented to a search of both his car and his apartment. The police could not find the automobile, but did explore the residence.

On the following morning, the police again tried to obtain a hearing on the capias and were again thwarted by inclement weather. Fuentes remained in custody. On that same morning (March 4, 1978), the police went to the victims' home; shortly after noontime, they discovered the bodies of the Dias women buried in the earthen floor of a room adjacent to their basement apartment.

While this activity was taking place, Ruginski called the Providence police department at approximately 3:20 p.m. Both Springer and Mitchell were at the scene of the crime; in their absence, Ruginski ap-

---

4. References are to the transcript of the suppression hearing held in the superior court immediately in advance of the trial. Evidence in the suppression hearing was taken on six separate days from October 2, 1980 through October 10, 1980.

5. It seems to be a logical inference from the record that the Providence police had called the capias to the attention of the Pawtucket officers coincident with their request *to find Fuentes.

6. The petitioner makes much of the fact that the arresting officers did not arrange a hearing on the capias before questioning him about the disappearance of the victims. This court does not credit that argument. The petitioner does not contest in this proceeding the validity of the bench warrant. Fuentes was validly apprehended. Without more, error of constitutional proportion does not inhere in attempting to question the witness first and thereafter to arrange for a hearing on the capias. The fact that circumstances beyond the control of the police frustrated their good-faith attempt to convene such a hearing should not require a different result. This is particularly true in light of the trial justice's finding that the arrestee was taken before a state district court judge "without unnecessary delay" as mandated by Rule 5(a) of the R.I.R.Crim.P. *See* T. 383–85. That finding is abundantly cushioned by the facts of record.

parently spoke with detective Ethier. While Ethier did not testify, Ruginski stated that he inquired as to whether or not the petitioner was in custody. He received an affirmative answer and was told that Fuentes was being held pursuant to a capias. Ruginski asked whether the capias had originated from the district or superior court. Ethier, after checking with a source or sources unknown, told Ruginski that the capias had been issued by a state district court judge. Ethier did not inform Ruginski of the petitioner's involvement in the ongoing murder investigation; indeed, there is nothing in the record which indicates that Ethier was aware of this twist.[7] Ruginski then asked about arranging for the petitioner's release; Ethier informed him to discuss this subject with one of the officers on the case. Since neither officer was on the premises and since Ruginski felt no sense of urgency anent Fuentes's plight, the attorney decided to attend to other business which he deemed more pressing, and to follow up on the Fuentes matter at a more convenient time.

Springer and Mitchell returned to the Providence police station approximately one-half hour after this telephone call. They brought photographs of the bodies. Fuentes was transferred to an interrogation room and was again read his *Miranda* rights. He was not informed of Ruginski's call; indeed, the record is devoid of any evidence that the investigating officers were so informed upon their return to the station. Fuentes signed a waiver form and police questioning commenced. At no time during the interrogation did the petitioner stop answering questions or demand that his lawyer be present. Eventually, the po-

lice obtained a parol confession.[8] During the transcription of this confession, the police again warned Fuentes of his rights. A further waiver was embodied within the inculpatory statement and was duly signed.

Some four hours subsequent to his mid-afternoon call (and after the confession had been signed, sealed and delivered), Ruginski telephoned the police station once more. Mitchell informed Ruginski that the petitioner was being held on twin charges of murder in the first degree, and that Fuentes had confessed to the commission of the crimes. Ruginski, nonplussed by this untoward turn of events, raced to the station house. Upon arrival, he was taken immediately to the petitioner. Charges were preferred, and formal criminal proceedings thereupon ensued.

Prior to trial, the defense moved to suppress the confession. After a plenary hearing, the trial justice found that Fuentes's command of English was sufficient for him to comprehend his rights, that there was no credible evidence of any beating, and that the petitioner voluntarily, intentionally, and knowingly relinquished his right against self-incrimination. T. 366–86. The jury trial and the convictions followed. On appeal, the petitioner contested the denial of his suppression motion. He claimed that the confession had been euchred from him in violation of (i) his right against self-incrimination, (ii) his right to counsel, and (iii) his right to due process of law. The Rhode Island Supreme Court explicitly rejected the first two of these contentions and implicitly rejected the third. *State v. Fuentes, supra.* The instant application for

---

7. Fuentes argues that Ethier must have been familiar with an in-progress investigation of such a heinous crime. Yet, this is sheer speculation. While references in the record plainly indicate that detective Dwyer (who assisted betimes) and Captain Wilson (the responsible superior officer) were attuned to developments in this double fatality, no such illation can be drawn vis-a-vis Ethier; nor does the petitioner suggest how Ethier would have acquired such insight.

8. While Fuentes did make an allegation of police brutality in his subsequent motion to suppress, there is absolutely no credit-worthy evidence that physical force, psychological duress or other impermissible techniques were employed during the interrogation process or were productive, directly or indirectly, of the confession. In any event, the state courts have found as a fact that no force was brought to bear, and that finding is supported by the record. It is, perforce, controlling here. *Sumner v. Mata,* 455 U.S. 591, 597, 102 S.Ct. 1303, 1307, 71 L.Ed.2d 480 (1982).

a writ of habeas corpus was thereupon filed in this court.

## II. *Exhaustion of Remedies*

■ As a matter of comity, federal habeas claims arising out of state prosecutions will not ordinarily be heard unless and until they have been aired before the state courts. 28 U.S.C. § 2254(b)–(c). *See Rose v. Lundy,* 455 U.S. 509, 515–18, 102 S.Ct. 1198, 1201–1203, 71 L.Ed.2d 379 (1982); *Sundel v. Justices of the Superior Court,* 570 F.Supp. 1131 at 1133–34 (D.R.I.1983).

■ Exhaustion of state remedies does not require, however, that the state courts determine expressly each and every issue, but only that the claims asserted in the federal habeas petition be presented to, and addressed fully in, the state courts. *Smith v. Digmon,* 434 U.S. 332, 334 (1978); *Williams v. Holbrook,* 691 F.2d 3, 8 (1st Cir. 1982); *Sundel,* at 1133. As this court has recently had occasion to observe:

> The doctrine demands only that the state courts be accorded a meaningful opportunity to confront the federal constitutional claims of a habeas petitioner before the district court asserts jurisdiction; the decisive question is whether or not the "substance" of the asserted claims have been squarely tendered to the state judiciary. *Anderson v. Harless,* —— U.S. ——, 103 S.Ct. 276, 277, 74 L.Ed.2d 3 (1982); *Eaton v. Holbrook,* 671 F.2d 670, 671 (1st Cir.1982).

*Id.,* at 1133.

The gravamen and scope of the contentions asserted by Fuentes in this tribunal closely parallel those which he argued before the state courts. The positions which he avows here cannot fairly be said to "transform his claim or cast it in a significantly different light." *Domaingue v. Butterworth,* 641 F.2d 8, 12 (1st Cir.1981). The conclusion of the magistrate to the effect that Fuentes has duly exhausted his state remedies within the meaning of 28 U.S.C. § 2254(b), *see* Report at 8–9, cannot be faulted.

## III. *Overview of the Petitioner's Claims*

Fuentes stakes out his claim on the grounds that the conduct of the Providence police abridged rights guaranteed to him by the Fifth, Sixth and Fourteenth Amendments. In so doing, he castigates both the actions and the omissions of the police officers. He contends, first, that the failure of the detectives to advise Ruginski of the ongoing murder investigation (and of the petitioner's featured role in that drama) undercut his Sixth Amendment right to the efficacious assistance of counsel. Independent of that putative constitutional violation, the petitioner also argues that the failure of the police to inform him of Ruginski's call precluded a knowing and intelligent waiver of his Fifth Amendment right against self-incrimination (and, as a necessary corollary, deprived him of the protections of *Miranda v. Arizona, supra* ). ˙Lastly, Fuentes claims that the overall conduct of the gendarmie was so flagrantly iniquitous as to deny him due process of law.

The state argues that the petitioner's view of the Sixth Amendment attenuates the reach of that amendment beyond its established perimeters: in effect, the state asserts that the right to counsel under the Sixth Amendment does not attach until the inauguration of formal criminal proceedings (of which arrest is not one). The state maintains, further, that the trial justice's finding of voluntariness is supported by the record and should be upheld under 28 U.S.C. §§ 2254(d) and *Sumner v. Mata, supra;* and that, in any event, Fuentes repeatedly, knowingly and intelligently waived both his right against self-incrimination and his right to counsel. Finally, the state urges that the petitioner, despite whatever lapses in protocol may have occurred (and the respondent concedes none), received process that was due.

The magistrate concluded that Fuentes had been "denied his constitutionally-protected right to the effective assistance of counsel during custodial interrogation resulting in a confession which was used against him at trial." Report at 19. The magistrate, in reaching this result, treated

the Fifth and Sixth Amendment arguments symbiotically, and did not rest his recommendation on one to the exclusion of the other.[9]

### IV. *The Sixth Amendment*

The Sixth Amendment to the United States Constitution provides in material part that the accused shall have "the Assistance of Counsel for his defence." The Supreme Court has made it clear that, once formal adversary proceedings commence (whether by way of formal charge, preliminary hearing, indictment, information, or arraignment), the right to assistance of counsel inures. *Moore v. Illinois,* 434 U.S. 220, 226, 98 S.Ct. 458, 463, 54 L.Ed.2d 424 (1977). The petitioner asserts that this right extends to instances of custodial interrogation; and thus, he should have had counsel present during questioning. Moreover, as the petitioner points out, the waiver standard applicable to Sixth Amendment rights demands the imparting of more information than is required for a Fifth Amendment waiver. *United States v. Satterfield,* 558 F.2d 655, 657 (2d Cir.1976); *see Fields v. Wyrick,* 706 F.2d 879, 880–81 (8th Cir.1983). Hence, Fuentes reasons, even if his multiple waivers were sufficient for Fifth Amendment purposes, no valid waiver of his rights adequate to satisfy the imperatives of the Sixth Amendment was secured.

▪ Here, at the moment of interrogation, no formal proceedings had been initiated. A double murder was being investigated and suspicion had focused on the petitioner. He was undergoing questioning in the course of the investigation. Formal proceedings had not then—and might never have been—commenced by the state. The great weight of authority supports the proposition that arrest and questioning do not constitute a sufficient formalization of proceedings to trigger the requirement of counsel under the Sixth Amendment.[10] *United States v. Dobbs,* 711 F.2d 84, 85 (8th Cir.1983); *United States v. Franklin,* 704 F.2d 1183, 1189 (10th Cir.1983); *United States v. Guido,* 704 F.2d 675, 676 (2d Cir.

9. At oral argument in this court, the Attorney General admitted that the state had not advanced its position in the strongest fashion before the magistrate. While such an omission was attributed to "short notice" as to the hearing held by the magistrate, that lament sounds much more like an excuse than a reason. The magistrate, the court and the citizenry have a right to expect better.

10. The petitioner relies on *United States v. Nashawaty,* 571 F.2d 71 (1st Cir.1978) and *United States v. Miller,* 432 F.Supp. 382 (E.D.N.Y. 1977) in positing his theorem that the Sixth Amendment attaches upon custodial interrogation. The reliance is misplaced.

Although the First Circuit uses language broad enough arguably to support the petitioner's contention, this court does not believe that *Nashawaty* paints with so broad a stroke. There, the defendant moved to suppress conversations between himself and a government witness, claiming that use of the taped communications violated his right to counsel. The court held otherwise. 571 F.2d at 75. In doing so, Judge Campbell pointed out that the accused, at the time in question, had been neither indicted nor arrested. *Id.* Absent one of those two occurrences, the right to counsel did not attach and the use of the conversations did not violate the defendant's rights. *Id.* While *dicta* in *Nashawaty* may, viewed through a rose-colored glass, lend comfort to the petitioner's assertions here, the case plainly does not hold that an individual's Sixth Amendment right to counsel attaches upon arrest.

*Miller* is likewise distinguishable. First, *Miller* is limited to its own facts—and these facts differ significantly from those upon which the case at bar rests. And second, *Miller*—while perhaps reaching the correct result on its facts—enunciates a distorted view of the law. In *Miller,* the defendant had retained counsel and had invoked his right to silence; the police had been told by Miller's lawyer not to question the suspect unless the lawyer was present. The police nevertheless proceeded to interrogate Miller without the presence of counsel. This invocation of Miller's Fifth Amendment right was misconstrued by the court as the initiation of defendant's Sixth Amendment right to counsel. Such a holding contravened existing precedent in the Second Circuit to the effect that arrest and custodial interrogation does not catalyze the Sixth Amendment right to counsel. *United States v. Duvall,* 537 F.2d 15, 22 (2d Cir.1976), *cert. denied,* 426 U.S. 950, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976). *Duvall* tracks principles established by the Supreme Court, *see Moore v. Illinois,* 434 U.S. at 226, 98 S.Ct. at 463, and recently reaffirmed by the Second Circuit. *United States v. Vasquez,* 675 F.2d 16, 17 (2d Cir.1982). To cede precedential force to *Miller* as urged by the petitioner would merely serve to compound its error.

1983); *Tarpley v. Estelle,* 703 F.2d 157, 162 (5th Cir.1983); *Logan v. Shealy,* 660 F.2d 1007, 1012 (4th Cir.1981), *cert. denied,* 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982); *United States v. Traficant,* 558 F.Supp. 993, 996 (N.D.Ohio 1983). Given the circumstances and timing of Fuentes's confession, his Sixth Amendment guarantees had not yet ripened to fruition. Thus, since the petitioner did not enjoy a Sixth Amendment right at the arrest stage, the court need not consider whether his seriatim waivers of his Fifth Amendment rights comported with the Sixth Amendment waiver standard. And, insofar as the Report relies upon the Sixth Amendment as a basis for the magistrate's recommendation, it cannot be accepted.

## V. *The Fifth Amendment*

### A. What the Police Told (Failed to Tell) Ruginski

The Fifth Amendment of the Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." In the landmark case of *Miranda v. Arizona, supra,* the Supreme Court limned certain safeguards to which a person subject to custodial interrogation is entitled in order to protect his or her right against auto-incrimination. Among these protections are (i) the right to have counsel present at any interrogation and (ii) the right to remain silent until the presence of an attorney is secured. *Id.* 384 U.S. at 467–70, 86 S.Ct. at 1624–1625, 1626. These rights, however, are not indelibly etched in granite.

The Court's holding in *Miranda* does not wholly debar questioning in the absence of counsel, for the "defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently," 384 U.S. at 444, 86 S.Ct. at 1612; the implementation of such interro-

gation, however, places on the government a "heavy burden to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Id.* at 475, 86 S.Ct. at 1628. As the courts have made manifest since *Miranda,* the right to counsel in a custodial interrogation is derivative of the right against self-incrimination. *E.g., Hall v. Iowa,* 705 F.2d 283, 289 n. 4 (8th Cir.1983); *Kennedy v. Fairman,* 618 F.2d 1242, 1247–48 (7th Cir.1980), *cert. dismissed,* 449 U.S. 939, 101 S.Ct. 339, 66 L.Ed.2d 206 (1980); *Smith v. Wainwright,* 581 F.2d 1149, 1151–52 (5th Cir.1978). And, while it has been suggested that the *Miranda* safeguards are separable for waiver purposes, *e.g. Kennedy v. Fairman, supra,* a volitional and informed cession of the right against self-incrimination by its nature subsumes the protection afforded by the right to counsel. That is to say, if the right to have counsel present during questioning is designed to assist an individual in exercising his privilege not to incriminate himself, then an uncoerced decision knowingly and intelligently to waive the latter necessarily swallows up the former.[11] The provision of counsel to protect a waived right would be a hollow exercise in futility, akin to padlocking the barn door subsequent to the horse's departure.

The centerpiece of the petitioner's case is the asseveration that the police, during the mid-afternoon discussion of March 4 between Ruginski and Ethier, failed to inform the attorney of the gravity of the petitioner's predicament—and, in fact, lulled Ruginski into a false sense of security. Such conduct, Fuentes argues, played havoc with his constitutional rights.

 While Fuentes contends that Ethier's comments were *deliberately calculated to mislead* Ruginski (a contention hotly dis-

---

11. This does not suggest that the availability or non-availability of advice of counsel may not impact upon the voluntariness of the waiver of the Fifth Amendment privilege, as of course it does. Nor can it be gainsaid that counsel, if requested, should be present despite a free and informed decision to relinquish the right to re-

main silent. What lies at the core of this observation is a question of primacy: a person who has opted to waive his right against self-incrimination must necessarily have waived (or otherwise satisfied) the other protections derivative therefrom. The whole is, after all, but equal to the sum of all of its parts.

puted by the state), and while Fuentes further urges that an attorney-client relationship then and there existed between Ruginski and the petitioner (a conclusion which is not only resisted by the respondent, but which has been explicitly rejected by the state supreme court, *see State v. Fuentes,* 433 A.2d at 191), resolution of neither of these points is essential to a disposition of this issue. Since, at the time of the call, no Sixth Amendment right to counsel had attached, *see* text *ante,* any misinformation relayed to Ruginski could not have violated a right that had not yet come into existence.

■ Nor did Ethier's failure to inform Ruginski of the situation violate petitioner's Fifth Amendment right to remain silent. The sockdolager is simply this: petitioner's right against self-incrimination is personal; it cannot be invoked or waived by anyone other than the person to whom the right attaches. *See United States v. Nobles,* 422 U.S. 225, 233, 95 S.Ct. 2160, 2167, 45 L.Ed.2d 141 (1975); *United States v. Hathaway,* 534 F.2d 386, 402 (1st Cir.1976), *cert. denied,* 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976); *United States v. LePera,* 443 F.2d 810, 812 (9th Cir.1971), *cert. denied,* 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971). Even if Ethier's conduct infringed on an existing attorney-client relationship (and for this purpose the court makes no determination either as to the contemporaneous existence of such a relationship or as to the fact of such infringement), it could not violate petitioner's Fifth Amendment right not to incriminate himself unless the conversation itself somehow affected *petitioner's* capacity to invoke his rights. The discussion between Ethier and Ruginski could not, in and of itself, have abridged the petitioner's Fifth Amendment rights, irrespective of how it may have transgressed either Ruginski's sensibilities or his perceived privileges *qua* attorney.

### B. The Per Se Rule

This determination is not, however, decisive as to the petitioner's self-incrimination argument. There is considerably more legal force to the thesis that, by neglecting to tell Fuentes about the telephone call from Ruginski (and arguably, about Mitchell's earlier conversation with Ruginski), the police impermissibly hampered his ability to act in a reasoned manner. The tenor of the argument runs as follows: being kept in ignorance of Ruginski's inquiry and interest, Fuentes could not make a voluntary, knowing, and intelligent waiver of his right against self-inculpation since all of the circumstantial knowledge essential to formulate that decision had not been disclosed to him. The petitioner, in essence, urges this court to adopt a rule suppressing any statements made after a waiver if a lawyer has tried to contact the suspect and the fact of such attempted communication has not by design or otherwise, been brought to the attention of the individual.

The proposed doctrine is not without substantial judicial support. The state courts that seemingly have adopted the rule, *e.g. Weber v. State,* 457 A.2d 674, 686 (Del. 1983); *People v. Smith,* 93 Ill.2d 179, 66 Ill.Dec. 412, 442 N.E.2d 1325, 1329 (1982); *People v. Arthur,* 22 N.Y.2d 325, 239 N.E.2d 537, 539, 292 N.Y.S.2d 663, 665–666 (1969); *Commonwealth v. Hilliard,* 471 Pa. 318, 370 A.2d 322, 324 (1977), have reasoned that the failure to inform prevented the individual from making a voluntary, knowing and intelligent waiver since critical information had been withheld. *But see State v. Burbine,* 451 A.2d 22, 29–30 (R.I.1983); *State v. Smith,* 294 N.C. 365, 241 S.E.2d 674, 680–81 (1978). These courts conclude that such an individual, given the benefit of this type of information, might react differently, i.e., that the suspect might be less willing to bypass counsel and-or to discuss the facts if he knows that a lawyer is interested and readily available. As expostulated by the Oregon high court:

> To pass up an abstract offer to call some unknown lawyer is very different from refusing to talk with an identified attorney actually available to provide at least initial assistance and advice... A suspect indifferent to the first offer may well react quite differently to the second.

*State v. Haynes,* 288 Or. 59, 72, 602 P.2d 272 (1979), *cert. denied,* 446 U.S. 945, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980).

The Report, in effect, succumbs to the blandishments of this rule. In so doing, the magistrate relied heavily on *Commonwealth v. McKenna,* 355 Mass. 313, 244 N.E.2d 560 (1969), which is prototypical of the line of cases mentioned above.[12] In *McKenna,* the defendant had been represented in another case by an attorney. While in custody at the police station in Revere, this attorney called to inquire about his client. He was told that his client would not be questioned until he was brought to Boston. Yet, at the very moment of this conversation, the defendant was being interrogated; no attempt was made to inform him that his lawyer was on the telephone or that the attorney had tried to contact him. By the time counsel arrived on the scene in Boston, the police had garnered a number of incriminating statements. The Massachusetts court held that the defendant's lack of knowledge anent attempts by his lawyer to communicate with him prevented the defendant from making an intelligent and knowing waiver of his rights. *Id.* at 324, 244 N.E.2d at 566.

■ These state court cases appear to adopt the sort of *per se* rule urged here by Fuentes. But, there is scant warrant, from a federal constitutional perspective, in imposing such a bright-line demarcation. Whatever sustenance the proponents of the rule may have found for this position in *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), has been materially diluted by subsequent decisions of the Court. *E.g., Brewer v. Williams,* 430 U.S. 387, 405–06, 97 S.Ct. 1232, 1242–1243, 51 L.Ed.2d 424 (1977); *Kirby v. Illinois,* 406 U.S. 682, 689–90, 92 S.Ct. 1877, 1882–1883, 32 L.Ed.2d 411 (1972). The cases are legion throughout the various federal circuits to the effect that, notwithstanding the knowledge of law enforcement officials that a suspect is represented by counsel or is plan-

ning to engage counsel, questioning may proceed without the attendance or acquiescence of the attorney *so long as* a valid waiver has been secured. *Hance v. Zant,* 696 F.2d 940, 947 (11th Cir.1983); *United States v. Brown,* 569 F.2d 236, 238–39 (5th Cir.1978) (en banc); *Moore v. Wolff,* 495 F.2d 35, 37 (8th Cir.1974); *United States v. Cobbs,* 481 F.2d 196, 199–200 (3rd Cir.1973), *cert. denied,* 414 U.S. 980, 94 S.Ct. 298, 38 L.Ed.2d 224 (1973); *United States v. Zamora-Yescas,* 460 F.2d 1272 (9th Cir.1972), *cert. denied,* 409 U.S. 881, 93 S.Ct. 210, 34 L.Ed.2d 136 (1972); *United States v. Gordon,* 493 F.Supp. 808, 812 (N.D.N.Y.1980), *aff'd on other grounds,* 655 F.2d 478 (2d Cir.1981); *see United States v. Monti,* 557 F.2d 899, 904 (1st Cir.1977). If no constitutional infraction automatically takes place when the police question a suspect who they have reason to know is represented by counsel, none should *ipso facto* occur merely because of neglect to inform the suspect of an attempt by an attorney to contact him. Rather, the relationship of the suspect to the attorney, the extent of the knowledge enjoyed by the authorities, the nature of the lawyer's request, and all kindred factors, become part and parcel of the "totality of the circumstances" which must in all events be sifted and weighed in determining whether or not a free and sentient waiver of the rights to remain silent and to the presence of an attorney has been effectuated. *See Oregon v. Bradshaw,* —— U.S. ——, ——, 103 S.Ct. 2830, 2833, 77 L.Ed.2d 405 (1983); *Edwards v. Arizona,* 451 U.S. 477, 482, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981); *United States v. Montgomery,* 714 F.2d 201 at 203 (1st Cir.1983). Trickery, of whatever sort, can be a basis for invalidation of such a waiver. *Miranda v. Arizona,* 384 U.S. at 461, 86 S.Ct. at 1620–1621. And, as has been noted before, the burden of establishing waiver "is on the government and is a heavy one." *United States v. Montgomery,* at 203–204. "The question is not one of form, but rather whether the defendant in fact knowingly and voluntari-

---

12. In May of 1983, the Massachusetts Supreme Judicial Court reaffirmed, and indeed broadened, its holding in *McKenna. See Common-* *wealth v. Sherman,* 389 Mass. 287, 450 N.E.2d 566 (1983).

ly waived the rights delineated in the *Miranda* case". *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979).

In sum, this court finds the *per se* rule urged by the petitioner to be an artificial barrier to law enforcement warranted neither by constitutional precedent nor by common sense. And, having so held, the court must likewise abjure the easy lure of disposing of cases by choosing among a series of neatly-labelled pigeonholes, and turn to the more demanding task of analyzing the full panoply of facts and circumstances which impacted upon the petitioner's actions in the case at bar.

C. The Totality of the Circumstances

In assaying the validity of the waiver relied on by the state, the court must examine all of the pertinent facts and circumstances of the case, especially those surrounding the alleged waiver(s) of constitutional rights; and must also take into account "the background, experience, and conduct of the accused." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1939), *quoted with approval in Edwards v. Arizona,* 451 U.S. at 482, 101 S.Ct. at 1883; accord *North Carolina v. Butler,* 441 U.S. at 374–75, 99 S.Ct. at 1758. *See generally Oregon v. Bradshaw,* —— U.S. ——, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983). In its scrutinization of these factors, the court must accord great weight to the state court's findings of historical fact. *Sumner v. Mata,* 455 U.S. at 597, 102 S.Ct. at 1307.

One such finding is that made by the trial judge to the effect that the petitioner's command of the English language was adequate to enable him to understand and to appreciate the recounting of his *Miranda* rights. This finding is, it should be noted, supported by pervasive evidence in the record. Most telling on this point are the observations of the trial judge as to conduct and demeanor on the petitioner's part during the suppression hearing, T. 374–76— conduct and demeanor which appear totally inconsistent with Fuentes' feigned inability to communicate in English.

A second such finding is that pertaining to the utter absence of police brutality or similar coercive actions. *See* note 8, *ante.*

The finding of the state courts upholding the waiver and branding it as voluntary is, however, on a different footing. This is precisely the sort of question as to which a federal court, exercising its prerogatives under the Constitution and laws, must make an independent determination concerning voluntariness by applying appropriate legal principles to historical facts. *Brewer v. Williams,* 430 U.S. at 397 n. 4, 404, 97 S.Ct. at 1239 n. 4, 1242; *Hance v. Zant,* 696 F.2d at 947; *Martineau v. Perrin,* 601 F.2d 1196, 1198 (1st Cir.1979). In so doing, however, the subsidiary findings of fact as made by the state courts must be accorded *Sumner* deference.

The contours of the relevant evidence, viewed in this light, indicate that Fuentes waived his rights not once, but consistently and repeatedly. When initially questioned, a standard-form "rights card" was not only read to him and read by him—but was, indeed, filled in by Fuentes in his own hand and signed. T. 19. Later that day (March 3), he willingly executed two separate consent forms, authorizing the police to search both his car and his dwelling. T. 26–27. When first interrogated on March 4, his rights were read to him by Mitchell, then read aloud (from the card) by Fuentes himself. T. 33–36, 141. Again, he signed the form. *Id.* After he had originally confessed, his rights were read to him once more while a contemporaneous question-and-answer transcript was being prepared; his response, constituting a waiver, was noted in the transcript (which he thereafter certified). T. 40–41. On no occasion did he ask for an attorney, although the offer was made to him "several times". T. 44, 161–62. At no juncture did he attempt to bring the questioning to a halt, or attempt to invoke his right to remain silent. He was not under the influence of alcohol or mind-altering drugs of any sort. T. 316. He was not interrogated for unusual stretches of time, nor in peculiarly oppressive surroundings. The mark of the Inquisition in no way blemishes these proceedings.

Given the lengths to which the police went in these respects, the seriatim waivers are impugnable unless the failure to inform Fuentes of Ruginski's doings is of such weight as to tip the balance. In this inquiry, the critical question is whether the telephone call between Ruginski and Ethier contained information that, by fair estimation, would have changed the petitioner's appraisal and understanding of the circumstances. In discussing Ruginski's involvement, it should be noted that the state court finding that no attorney/client relationship inhered as between Ruginski and Fuentes is not, under *Sumner,* binding upon this court. *Cuyler v. Sullivan,* 446 U.S. 335, 341–42, 100 S.Ct. 1708, 1714–1715, 64 L.Ed.2d 333 (1980).[13]

There is no doubt but that Ruginski had apparently, from time to time, represented Fuentes.[14] As an instance, Ruginski was, from and after December 15, 1977, counsel of record for Fuentes in respect to the very assault case which led to the issuance of the aforementioned capias. Similarly, Ruginski had been petitioner's counsel in the defense of a felony case pending in the superior court. On February 27, 1978, however, Ruginski moved to withdraw in that case, attaching to his motion a written notice of discharge tendered to him by Fuentes under date of February 24. On February 28, the motion was granted; and Fuentes, by choice, was facing the imminent trial of a

serious felony charge *pro se.* The stage was set in this manner when the police indagation here at issue began to focus on the petitioner.

The first discussion with Ruginski took place on the evening of March 2. Since this conversation transpired before Fuentes was in custody, it cannot logically be styled as an attempt to contact the suspect within the ambit of the petitioner's theory. So, any effort to rely on this discourse to bulwark the proposition advanced by Fuentes necessarily collapses of its own weight.[15] The call, by its very nature and context, did not affect the totality of the circumstances facing Fuentes at and after the time when he was taken into custody.

The second conversation between Ruginski and the police (the March 4 discussion with Ethier) is a closer call, since Fuentes was then being held and had not yet confessed. Ruginski's actions, however, unlike the contacts initiated by lawyers in cases such as *State v. Haynes, supra,* could not fairly be characterized as comprising an attempt to contact Fuentes. The record reveals only that Ruginski inquired into the petitioner's situation vis-a-vis the capias. Yet, Ruginski well knew that suspicion might have attached to Fuentes in respect to the Dias disappearance. And notwithstanding this knowledge, Ruginski never inquired about the Dias probe, never requested that interrogation be deferred, never

13. In any event, although both parties imply that the existence or non-existence of such a relationship is directly dispositive of the issues surrounding Ruginski's dialogue with the authorities, this court demurs.

14. The record is replete with references to myriad criminal matters with which Fuentes had been involved. He was obviously, in March of 1978, no stranger to the criminal justice system. While such facts do not, in and of themselves, lighten the government's burden on the issue of voluntariness, they do show rather clearly that Fuentes had considerable background upon which to draw when apprehended. The defendant's "background" is, of course, a factor in the equation. *Edwards v. Arizona,* 451 U.S. at 482, 101 S.Ct. at 1883–1884.

15. At oral argument, petitioner's present counsel dwelt on Mitchell's supposed statement to Ruginski denying that he suspected Fuentes "of

anything." T. 177. Given the circumstances and timing (no bodies had been discovered, no concrete proof of the commission of any crime had surfaced, Fuentes had not yet been interviewed nor even located), the court cannot attach great weight to this comment. And, in any event, the content of the call, taken as a whole, is a far cry from an attempt to apprise Fuentes of his rights. Ruginski did not identify himself as attorney for Fuentes, and he disclosed what Fuentes had said to him. T. 176–77. He did not ask to be notified when Fuentes was apprehended. He did not request that Fuentes be told of the call. He did not seek to extract assurances that interrogation would be withheld until he could confer with Fuentes. Indeed, for aught that appears of record, Mitchell never regarded the call as having sufficient import either to include it in his report or to mention it to his partner (Springer).

suggested that he be present if questioning was to take place, and never asked that Fuentes be apprised of his call or of his interest. Further, despite Ethier's invitation to call back and speak with Springer or Mitchell, he dallied for four hours or so before touching that base.[16] Thus, it becomes apparent that this call, as well, cannot be viewed as a meaningful attempt to contact the suspect within the parameters of the test proposed by the petitioner.

And, even if the March 4 conversation amounted to such an attempt, this court cannot say that the information withheld by the police was of such significance as to shift the scales in favor of involuntariness.

Fuentes knew that Ruginski had acted as his lawyer in other matters, and could have remained silent until Ruginski appeared. He failed to elect that option. In point of fact, his initial waiver of rights occurred prior to the call in question. Not only upon initial interrogation but also at several stages thereafter, Fuentes chose to pull the leading oar without assistance of counsel. He had several opportunities to invoke his right against self-incrimination; he availed himself of none. His confidence in this regard (as reflected by his "corpus delicti" rejoinder, see T. 22) was of a piece with the discharge of his attorney in the felony case awaiting trial. His competency is not in question. He had some education at the junior college level. Throughout, his conduct evidenced a firm, abiding, calculated, and continuing intention to waive his right against self-incrimination and his right to counsel. Even if revealed, there is little reason to believe that, in the circumstances of this case, the revelation would have deterred Fuentes from his chosen course. And, more important, given the nature of

the Ruginski/Ethier interlocution and the situation as a whole,[17] it cannot be said that the police were constitutionally required to disclose either the fact or the content of that colloquy to the petitioner as a condition precedent to securing a valid waiver.

■ The court finds, therefore, that the state has successfully shouldered the heavy burden of establishing the validity of the petitioner's waiver; that the waiver was made sentiently and in the free, informed, and unhampered exercise of the petitioner's judgment, and was wholly volitional; and that Fuentes voluntarily, knowingly, and intelligently ceded his *Miranda* rights. Insofar as the magistrate's recommendation runs to the contrary, the court must decline to accept it.

## VI. *The Fourteenth Amendment*

Fuentes's final contention is that the conduct of the police was so fundamentally unfair as to deny him due process of law. The petitioner argues that the strictures of the Fourteenth Amendment condemn these actions even if they did not contravene either the Fifth or Sixth Amendments. In substance, the petitioner claims that the state must treat a criminal suspect with elementary fairness; and that the "deception" practiced by the police on both Ruginski and Fuentes is at odds with this constitutional guaranty.

The petitioner's argument is not without some superficial appeal. There have been instances in criminal proceedings in which the courts have held that the conduct of law enforcement officials is so inimical to the principles of basic fairness on which our system of jurisprudence is bottomed that an accused must be granted safe harbor.

---

**16.** It is noteworthy, too, that Ruginski was the attorney of record for Fuentes in the case wherein the bench warrant had been issued. Viewed in that light, Ruginski's remarks were perfectly consistent with his role as counsel for that purpose: he cared not about interrogation, but only about obtaining his client's release. Ethier, uninformed as to the Dias double murders either by his colleagues (who had no reason to bring him in on their investigation) or by Ruginski, had no knowledge to impart to Ru-

ginski—and no reason to mention his call to Springer or Mitchell.

**17.** The "gap" in the police/Ruginski and police/Fuentes discussions cannot be given the pivotal weight urged by the petitioner, since, in all events, the information which would have been relayed to close the gap was already in the petitioner's grasp. Fuentes cannot be heard to argue now, with 20/20 hindsight, that this unoriginal information would have constituted a crucial piece of datum for him.

For example, the Supreme Court has proscribed prosecutorial or judicial vindictiveness as violative of due process when one who has successfully challenged a conviction is later retried or resentenced on more serious charges. *Blackledge v. Perry,* 417 U.S. 21, 27–28, 94 S.Ct. 2098, 2102–2103, 40 L.Ed.2d 628 (1974); *North Carolina v. Pearce,* 395 U.S. 711, 724, 89 S.Ct. 2072, 2080, 23 L.Ed.2d 656 (1969). In certain circumstances, it has been held that draconian limitations on the right of cross-examination may violate due process. *See Watkins v. Sowders,* 449 U.S. 341, 348–49, 101 S.Ct. 654, 658–659, 66 L.Ed.2d 549 (1981); *United States v. Hawthorne,* 620 F.2d 1026, 1035–36 (4th Cir.1980). And, the concept of fundamental fairness has likewise been applied to preindictment identifications. *Neil v. Biggers,* 409 U.S. 188, 196–200, 93 S.Ct. 375, 380–382, 34 L.Ed.2d 401 (1972); *Stovall v. Denno,* 388 U.S. 293, 301–02, 87 S.Ct. 1967, 1972–1973, 18 L.Ed.2d 1199 (1967).

In each of these instances, however, the judiciary adopted a due process analysis because the violations fell within the interstices of the protections provided by the Fourth, Fifth, Sixth, and Eighth Amendments. Thus, the courts, faced with situations not directly affecting specified rights, but nonetheless so unfair as to shock the conscience, turned to the due process clause for succor. Petitioner's case, to the contrary, does not descend into any crevice in the landscape of available constitutional protections.

Rather, the official behavior which Fuentes criticizes stands squarely on the parade ground of the Fifth and Sixth Amendments; and it has passed muster under those amendments. *See* text *ante.* The petitioner argues, in effect, that although the fruits of the interrogation may be constitutionally adequate under such a standard, the procedure should nonetheless be subject to a further due process examination. Yet, *Miranda* and its progeny provide a safety net for the accused which stalwartly guards constitutional rights; and

this safety net is, by any rational criterion, sufficient unto itself in the areas which it implicates. Is there, then, any justification for the courts to attempt to enlarge *Miranda* by subsuming Fifth and Sixth Amendment rights in a catch-all Fourteenth Amendment sweep?

The question suggests the answer. The American justice system is renowned throughout the world for the sensitive and delicate care with which it treats procedural safeguards; and the rights of criminal defendants have time and time again been upheld, often at the cost of permitting the guilty to go free. While scholars of jurisprudence may endlessly debate whether or not the pendulum has swung too far, one thing is clear: there is scant warrant for the judiciary mindlessly to pyramid neoteric protections upon the panoply of existing safeguards. Even the Constitution knows some bounds. To this end, modern courts, in the reasoned articulation of Fifth and Sixth Amendment rights, have abandoned the atavistic due process analysis which formerly held sway. *Compare Miranda v. Arizona* and *Kirby v. Illinois,* both *supra, with Payne v. Arkansas,* 356 U.S. 560, 567–68, 78 S.Ct. 844, 849–850, 2 L.Ed.2d 975 (1958). If the police grant to the suspect the rights limned in *Miranda* and in *Kirby,* according to the tenor of the rule, then the suspect has been treated with all the equity required of the criminal justice system in that regard; and the slippery slope of fundamental fairness need not—and should not—be independently addressed in terms of the self-same subject matter.

■ Regardless of the desirability of the police conduct at bar,[18] the petitioner could have insulated himself by invoking the protections of *Miranda.* The warnings accorded to him were full and fair, and his opportunities to claim the privilege were manifold. His failure to do so cannot now redound to affect the efforts of the police. His neglect was his own; and that neglect

---

18. Note, too, that even if this conduct violated police ethics, such normative violations by themselves do not constitute breaches of the Constitution. *See United States v. Monti,* 557

F.2d 899, 904 (1st Cir.1977); *United States v. Crook,* 502 F.2d 1378, 1380 (3rd Cir.1974), *cert. denied,* 419 U.S. 1123, 95 S.Ct. 808, 42 L.Ed.2d 823 (1975).

cannot and should not be palmed off as violating a penumbrous Fourteenth Amendment (irrespective of what may seem to be less than complete professionalism on the part of the police). An application for habeas relief does not pivot on whether a district judge approves or disapproves of police methodology; the only issue, at bottom, is whether the legitimate constitutional rights of the petitioner have been abrogated in some meaningful way. No such abrogation occurred here.

### VII. *Conclusion*

For the reasons set forth herein, the objection to the Report is sustained; and the instant petition for habeas corpus is denied and dismissed.

*So ordered.*